Filed 2/13/13

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)     S026634
    v. )
)
PAUL SODOA WATKINS, )
)     Los Angeles County
    Defendant and Appellant. )     Super. Ct. No. KA005658
_____ )

## ORDER MODIFYING OPINION AND
## DENYING PETITION FOR REHEARING

**THE COURT:**

The opinion in this matter filed on December 17, 2012, and appearing at 55 Cal.4th 999, is modified as follows:

On page 1009, line 30, the opinion currently states: "*At that point, Mrs. Watkins related, defendant began to fall under the gangs' influence;* at the same time, she testified, she could no longer afford parochial school, and so was forced to enroll defendant in a public school, where he did not adjust well, and was frightened by the gangs." As modified, the italicized part is now deleted. The sentence should now read: "At the same time, she testified, she could no longer afford parochial

school, and so was forced to enroll defendant in a public school, where he did not adjust well, and was frightened by the gangs."

This modification does not affect the judgment.

The petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,  )
      )
      Plaintiff and Respondent,  )
      )      S026634
v.  )
      )
PAUL SODOA WATKINS,  )
      )      Los Angeles County
      Defendant and Appellant.  )      Super. Ct. No. KA005658
_____)

In July 1990, defendant Paul Sodoa Watkins shot and killed Raymond Shield. A jury convicted defendant of the first degree murder of Shield (Pen. Code, § 187, subd. (a)), and found true the special circumstance allegation that defendant did so while in the commission of an attempted robbery.  (Pen. Code, § 190.2, subd. (a)(17)(A).)[1]  The jury further found defendant guilty of second degree attempted robbery of Shield (§§ 211, 213, subd. (a)(2)), and it found defendant guilty of three other second degree robberies of four other victims.[2]  After a separate penalty phase

---

[1]      All further statutory references are to the Penal Code unless otherwise indicated.

[2]      Moreover, as to the attempted robbery count, and each robbery count, the jury found true allegations that a principal was armed with a handgun within the meaning of section 12022, subdivision (a)(1).  As to three of the armed robbery counts, the jury found true allegations that defendant personally used that firearm within the meaning of section 1203.06, subdivision (a)(1), and section 12022.5.  Finally, the jury found

*(footnote continued on next page)*

1

trial, the jury fixed the penalty for defendant at death.[3]  The trial court denied defendant's motions for a new trial and to modify the verdict, and then imposed sentence — prison terms for the robberies, and death for the murder.  This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment in its entirety.

## I.  FACTS

### A.  *Prosecution evidence*

At approximately 3:30 a.m., on July 17, 1990, defendant, then 21 years of age, and his younger cousin, Lucien Martin, then 18 years of age (see *ante*, fn. 3), approached Anthony Orosco and his friend Juan Gallegos, who were seated in the cab of Orosco's black Nissan pickup truck, parked at a market in Home Gardens, Riverside County.  The truck was a 1990 model, approximately four months old. Defendant ordered the two men out of the truck and struck Orosco on the face with a black nine-millimeter semiautomatic pistol.  Defendant aimed the nine-millimeter pistol at Orosco and said, "get the hell out of here"; Orosco left his keys in the

---

*(footnote continued from previous page)*

true allegations that defendant (1) had suffered a prior conviction for "grand theft person" in violation of section 487.2, for which he had been committed to state prison, and that he committed a subsequent offense resulting in a felony within five years of the prison term within the meaning of section 667.5, subdivision (b); and (2) that defendant had suffered prior felony convictions, including the "grand theft person" violation in early May 1988, mentioned above, possession of a controlled substance in late May 1988, and another "grand theft person" violation in June 1987.

[3]      Defendant's younger cousin, Lucien Martin (Martin), was tried with defendant, and convicted on all charges.  With respect to Martin, the jury found true the special circumstance allegation, but sentenced Martin to life in prison without possibility of parole.  Accordingly, he is not a party to this appeal.

ignition and ran away. At the same time, Martin approached Gallegos and took his wallet and a distinctive gold necklace chain with an engraved star. Martin drove away in the truck, with defendant in the truck's bed, headed in the direction of the "91 Freeway," which was slightly more than one block way.

Approximately 90 minutes later — just before 5:00 a.m. — Martin and defendant drove the truck to the Greyhound bus station in Claremont, Los Angeles County. They stopped and asked Jihad Muhammed, who was standing alone, where he was going. When Muhammed replied that he was traveling to Wisconsin en route to New York, defendant said, "Then you must have some money." Thereafter, defendant displayed his nine-millimeter pistol and told Muhammed, "Give it up, throw it in the truck." After Muhammed did so and responded, "I don't know why you all do this to brothers," defendant replied, "Fuck a brother," and drove off with Martin. They escaped with only about $10 or $12 from Muhammed.

Within minutes — shortly after 5:00 a.m. — defendant and Martin drove to the covered vehicle entrance driveway of the West Covina Holiday Inn in Los Angeles County. Shortly before defendant and Martin arrived, 62-year-old Raymond Shield had driven his wife, daughter, and two grandchildren to that same location to take a shuttle bus to the Los Angeles International Airport, from where they planned to embark on a family vacation. As Shield unloaded the family's luggage onto the sidewalk, defendant and Martin arrived and parked just beyond and adjacent to the Shield family car, on the other side of the hotel's covered entrance driveway. Defendant and Martin got out of the stolen truck and opened its hood.

Shield walked a few steps over to the front of the truck and stood there with defendant and Martin. The raised hood partly obscured the view of members of the Shield family; they could see only Mr. Shield, standing there with his hands in his pockets, looking into the engine area. After approximately one minute, he hurried

3

away from the truck's passenger side, back toward his family's car. During this same time, defendant and Martin closed the truck hood and quickly got back into the truck — Martin in the driver's seat, and defendant in the passenger seat, with that door still open. Shield took approximately five long, brisk strides away from the truck with his hands still in his pockets. Defendant fired a single shot from his nine-millimeter pistol. The bullet passed through Mr. Shield's right forearm, just below the elbow, and then, above his right hip, through his abdomen, puncturing his bladder. He fell facedown and quickly died from loss of blood. The stolen truck sped away, "squealing" and "screeching its tires." The expended bullet was found by emergency responders beneath Mr. Shield's underwear, resting on his body; the bullet casing was found a few feet away.

Less than four hours later (just before 9:00 a.m.), defendant entered Steve's Market in Gardena, Los Angeles County. Kyung Sun Lee, the proprietor, was behind the cash register. Defendant asked for a pack of regular Camel cigarettes. When advised that the price was $1.95, defendant replied that he had only $1, and that he would leave and return with more money. Lee watched through a store window as defendant went to the truck, which was parked in front of the store, and spoke with Martin, who put a magazine into a gun. The two then entered the store; Martin stood near the entrance and pointed the gun at the cash register. Defendant opened the register, removed money, and took the pack of cigarettes. Meanwhile, Lee, who had armed himself with his own handgun, fired from behind the store's deli counter — at which point defendant and Martin fled in opposite directions, leaving the truck behind. Lee called the police.

Shortly thereafter, as Jeffrey Kamuela Lewis and his father stood outside their machine shop near Steve's Market, defendant and Martin walked down the street, straining for breath "as if they had been running," and "looking around" in different

4

directions "very suspiciously." Defendant approached Lewis's father and asked, "Remember me? I filled out an application last week." After Lewis's father replied that he did not recall, defendant asked to use a restroom. When Lewis's father declined, defendant asked, "What is your problem?" During this time, Martin stood by, acting like a "lookout man" — surveying the scene back and forth.

At that point, Gardena Police Department Detective Gerald Hudgeons, who had received a radio report of a robbery at Steve's Market, drove by in a marked patrol car, and he noticed Martin, who fit the description of one of the two suspects. When Lewis's father waved and called to the officer, defendant and Martin ran down a nearby alley. Thereafter, at approximately 9:00 a.m., David Morgan Boone, who was appraising a residence near Steve's Market, found, in an alley behind the residence, a firearm, later identified as defendant's nine-millimeter pistol, inside a hole in a brick wall. Soon thereafter police officers arrived and Boone gave them the weapon, which was missing its magazine, but had one live bullet in the chamber of the pistol.

Meanwhile, other police officers responded to Steve's Market, where they found the truck parked outside and a nine-millimeter's "banana style" magazine clip, loaded with numerous live rounds, on the floor of the store. One officer noticed Martin "low crawling" (that is, "kneel[ing] down with his hands tucked under his shins and just walking") alongside a brick wall in a nearby alley, and then saw him jump into a residential backyard. Within two hours, after conducting a door-to-door search assisted by a police dog, police officers found Martin and defendant, each attempting to hide behind bushes in separate residential yards. When booked into jail, Martin had the gold necklace chain with the engraved star belonging to Juan Gallegos, and defendant, who falsely identified himself as "Jeffrey Scott," possessed a pack of Camel regular cigarettes. On the day following defendant's arrest, he admitted his

5

real name, and when Detective David Melnyk told defendant that he was investigating an apparent robbery and murder at West Covina Holiday Inn, defendant replied by asking whether any property had been taken at that scene.

Subsequently, defendant's and Martin's fingerprints were found in many places on the stolen truck, and palm prints under the truck's hood matched defendant's. Currency totaling $59 was found on the floor of the truck. Distinctive acceleration skid marks left at the Holiday Inn scene matched the truck's tires, and the truck was found to be running well, with no mechanical problem. The expended bullet found under Raymond Shield's clothing and resting on his body, the bullet casing found a few feet away, and the magazine clip found at Steve's Market, all were matched to defendant's nine-millimeter pistol. Further testing revealed that the gun had a "heavy" trigger pull — 17.5 pounds (compared with the average nine-millimeter pistol's trigger pull of four-to-nine pounds) — making it at least twice as difficult to pull the trigger compared with most such firearms. Finally, all four crime scenes were located close to freeway ramps, and could easily have been reached by a pickup truck within the times of the various incidents.

B. *Defense evidence*

Defendant testified. He admitted the three robberies, but denied attempting to rob Shield and claimed that the shooting was accidental. He explained that he and Martin were cousins who had known each other all their lives, and that on July 16, 1990, they had driven their mothers' cars, along with Martin's mother, from defendant's home in Moreno Valley in Riverside County, to Los Angeles, so that Martin's mother's car could be serviced. The three spent the day, sometimes separately, in and around Compton. Later that evening, before the three drove back to Moreno Valley in defendant's mother's car, Martin showed defendant a nine-millimeter pistol that defendant had not previously seen. Defendant testified that he

6

commented to Martin that it was a "proper" gun — and that "We could jack some people with this gun." Defendant explained that he assumed the pistol was loaded "because it had a magazine in it." After defendant put the weapon in the trunk of his mother's car, they drove to pick up Martin's mother in Compton at approximately midnight, and then drove back to defendant's mother's house in Ontario. Defendant explained that he and Martin spoke "[a]bout robbing some people," and then drove, in defendant's mother's car, to the market in Home Gardens, where they saw "two Mexican guys in a truck." According to defendant, he produced the pistol and "asked [them] to give me the truck." Defendant testified that he jumped into the truck bed while Martin drove them back to defendant's mother's car, which they returned to her home in Ontario. At that point, defendant explained, they "got on the freeway [heading toward Los Angeles] and just went like looking for somebody to rob."

At the bus station in Claremont, they saw a "Black guy standing there" alone. Defendant testified that he said, "let's rob this fool." According to defendant, after they robbed Muhammed, Martin drove them back to the freeway, again heading toward Los Angeles, where they "wound up at the Holiday Inn," with Martin driving and defendant in the passenger seat, and decided to "try this place."

Defendant testified that they noticed a parked car, and a family unloading luggage, but that he did not intend to rob them because he was looking for a solitary victim, and the area was "kind of [too] well lit." He explained that he assumed the family would soon leave the scene, at which point he and Martin would wait for another victim to happen by, whom they would rob. He asserted, "I mean, I am not going to rob no kid, you know." He recounted that they parked "on the other side of the driveway," near the family's car, and then they decided to get out and lift the truck's hood, so as not to appear suspicious. Defendant explained that because he noticed that Shield was looking at him, he waved "hi" to him — again, so that they

7

would not appear suspicious — at which point Shield approached them, asking if they needed help. According to defendant, he assumed that the people unloading luggage would enter the hotel, and he told Shield that he needed no help and tried to "be rude to him" to encourage him to depart into the hotel "so we could find somebody . . . by themselves." Defendant asserted that Shield "got kind of offended" and then hurriedly retreated. Defendant testified that he did not demand or ask for money, and that he did not pull his gun from his waistband, but instead kept it concealed by his shirt. He testified that he is left-handed, and that he had inserted the gun into his waistband with his left hand, with the handle pointed to his left side.

Defendant explained that because of Shield's reaction to the refusal of his assistance, and Shield's rapid departure from the truck, "it was obvious that he knew something wasn't right about us," and hence defendant assumed that Shield planned to call the police. Defendant told Martin that they should leave, and he slammed the hood shut and hurried to the passenger door while Martin got into the driver's seat. According to defendant, he wanted to depart before Shield entered the hotel. Defendant testified that he opened the passenger door and positioned his left foot onto the floorboard but was unable to sit down with the gun stuffed into the front of his pants, and so he removed the gun with his right hand while balancing himself with his left hand on the seat. He asserted that he next thrust his right hand, then holding the firearm, outside the open passenger window and brought his right leg into the vehicle as he pulled the door closed with the back of his right hand — at which point the gun fired accidentally. Defendant explained that he was surprised by this, because he "didn't . . . pull the trigger" — and although he saw Shield fall, he could not believe that he had shot him. Defendant recounted Martin sped them away and asked defendant, "What . . . you doing?" and that he responded, "I didn't do it on purpose." Defendant expressed to the jury sorrow for the killing, and asserted that he "never

8

meant to hurt nobody that night" — he intended only to "scare them and make some money."

Defendant testified that after the Holiday Inn incident, he and Martin initially decided to return to Gardena to give the weapon back to its owner, but then concluded that because they had not been successful with their prior robberies, they were "back where we started from" — and so they decided to rob Steve's Market. According to defendant, his plan was to "case" the store, and if it was "all right," they would rob it together, this time with Martin acting as gunman.

Finally, defendant admitted that he had suffered two prior felony convictions for "grand theft person."

### C. *Prosecution rebuttal evidence*

Pamela Joyce Coryell, Raymond Shield's daughter, testified that the passenger door of the truck was open at the time her father fell to the ground. She recounted that the door closed after the shot was fired, after the truck began pulling away from the scene, and that she saw no gun or muzzle flash.

### D. *Prosecution penalty phase evidence*

Jeneane Shield, who had been married to the victim for 39 years, testified that she and her husband had four children and five grandchildren. Mrs. Shield explained that they had planned a trip to Hawaii; she and her daughter Pamela would go first with two of the grandchildren. Her husband, Raymond, an engineer and consultant for several companies, planned to go to work after dropping his family off at the hotel's airport shuttle, and then join the family on vacation a week later.

After Jeneane Shield heard the gunshot and saw her husband fall, she ran to him. As he lay on the ground, he told her, "I've been shot" — and then he said, "I'm dead" — his last words. Mrs. Shield recounted the arrival of paramedics, their attempt to aid her husband, and the drive to the hospital.

9

The prosecution presented evidence of two other acts of violence by defendant when housed prior to trial. The acts occurred in the county jail facility. In early June 1991, defendant was a major participant in a dorm fight. Los Angeles County Sheriff's Deputy Ricky Hampton testified that he saw defendant and other Black inmates fighting a group of Hispanic inmates. Hampton recounted that defendant struck other inmates with his fists, kicked them when they fell to the ground, and struck an inmate in the head with a 55-gallon coffeepot. According to Hampton, defendant was one of the last two inmates to stop fighting. In late June 1991, defendant, along with four other inmates, attacked Russell Cross, after Cross sat on the bunk of a Black inmate.[4]

E. *Defense penalty phase evidence*

A childhood friend of both defendant's and Martin's, Marsha Hightower, testified that defendant was quiet, shy, and "got along" with his family. She related to the jury that defendant had "a lot of good in [him]," and she pleaded for his life.

Defendant's half sister and senior by 10 years, Renita Watkins, who had lived with defendant until he was 13 years of age, described him as quiet, shy and fearful — someone who would not fight, but instead would run away. She pleaded for his life, explaining that the killing must have been accidental because defendant had been raised properly, and had a "beautiful personality."

Edward Miller, defendant's maternal uncle, testified that he had known defendant since birth. He explained that the family was close, and that defendant was

_____

[4]    In addition, the parties stipulated that defendant had suffered the prior convictions set forth *ante*, footnote 2.

a normal child who was respectful of his elders. Still, defendant's childhood environment was "somewhat dysfunctional"; his father regularly beat his mother, leading to their divorce. Thereafter the family moved to a new home and school in South Central Los Angeles which, Miller recounted, was at one point a nice residential neighborhood, but subsequently became infested with drugs and drug dealers. According to Miller, defendant's mother was a good parent, and showed him love and affection when growing up. He pleaded for defendant's life, and could not believe that defendant was a "coldblooded murderer," because that would not be consistent with defendant's character as Miller knew it.

Betty Watkins, defendant's mother, testified that she worked as an executive secretary and originally sent defendant to parochial school because she was not "satisfied with the public school system." She explained that defendant sometimes witnessed his father beating her, and that after the divorce, when defendant was eight or nine years of age, she worked two jobs in order to support her two children; she eventually managed to purchase a house, but the neighborhood thereafter "became progressively worse" — "all the little cute kids grew up to be gang members." At that point, Mrs. Watkins related, defendant began to fall under the gangs' influence; at the same time, she testified, she could no longer afford parochial school, and so was forced to enroll defendant in a public school, where he did not adjust well, and was frightened by the gangs.

Defendant's mother testified that her sister, Dorothy, was murdered in 1981 or 1982, that her other sister, Barbara, died of liver disease in 1984, and that defendant's paternal grandmother, the matriarch of the family and a stabilizing influence on the children, died in late 1984 or early 1985, by which time Mrs. Watkins found it increasingly difficult to moderate the neighborhood's bad influence on defendant. Thereafter, she explained, defendant's sister Kimberly — who was 13 months older

11

than he — was wounded, and five others were killed, in a driveby shooting while defendant was with her and a group of 10 other children and young adults. According to defendant's mother, this driveby shooting incident altered defendant's "whole personality," he became "more withdrawn" and began to "play hooky from school." For a short period the family attended counseling for victims of violent crimes, but that ceased when public funding ended, and Mrs. Watkins could not afford to pay privately for sessions. The family eventually moved from Los Angeles to Moreno Valley because she believed it to be "far enough away from the gangs and the bad influence," but nevertheless defendant "started to act out" and "get into some trouble." Mrs. Watkins further testified that she was "devastated" by her son's offenses, and that she commiserated with the Shield family, but she pleaded for her son's life, explaining that in her view he did not lack "a conscience."

Finally, Queenetta Green, who was defendant's algebra teacher, testified that immediately after defendant's transfer from parochial to public school, he was studious, obedient, enthusiastic, and protective of his sister Kimberly. Green explained that after Kimberly became a victim of the driveby shooting, however, defendant turned sullen, defiant, and disobedient. She too pleaded that the jury spare defendant's life.

F. *Additional prosecution penalty phase evidence*

After presentation of the defense evidence outlined above, the prosecution introduced additional evidence in aggravation concerning an incident that occurred at the "main lockup" of the Pomona courthouse jail holding facility in mid-March 1992 — on the first day of the penalty phase trial in this case. Defendant, who was at the time shackled with leg irons, and two other Black inmates kicked and punched another Black inmate. After the victim fell to the ground and lay in a fetal position, Sheriff's Deputy Ted Mossbarger saw defendant kick him in the back of the head, and

continue to do so after being ordered to stop. Thereafter, when Sheriff's Deputy Eugene Lindsay escorted defendant from the scene, defendant explained, "the reason this happened is that [the victim] raped my home boy's girlfriend."

## II. JURY SELECTION ISSUES

### A. *Failure to provide sequestered death qualification voir dire*

Defendant moved for sequestration of the prospective jurors during the death qualification voir dire process. The trial court denied the motion and informed counsel that it would conduct voir dire of prospective jurors in open court. Defendant claims that the resulting death qualification process violated his state and federal constitutional rights to due process, equal protection, trial by an impartial jury, effective assistance of counsel, and a reliable death verdict, as well as his right under Code of Civil Procedure section 223, to individual juror voir dire when group voir dire is not "practicable."

We repeatedly have rejected defendant's argument that the California or federal Constitution mandates individual sequestration of all prospective jurors during the death qualification process. (*People v. Thomas* (2012) 53 Cal.4th 771, 789 (*Thomas*), and cases cited.)

Our decision in *Hovey v. Superior Court* (1980) 28 Cal.3d 1 declared, pursuant to our supervisory authority over California criminal procedure, that sequestered voir dire should be conducted in capital cases in order to promote candor and reduce the possibility that prospective jurors might be influenced by the questions to and responses by other prospective jurors. (*Id.*, at pp. 80-81.) Code of Civil Procedure section 223, adopted in 1990 as part of Proposition 115, abrogated this aspect of our decision in *Hovey*. The statute provides in pertinent part: "Voir dire . . . shall, where practicable, occur in the presence of the other jurors in all criminal cases, including

13

death penalty cases." Defendant asserts that the trial court failed to exercise its discretion, or at least abused its discretion, by denying his motion for sequestered voir dire and by instead proceeding in open court under section 223.

Although counsel for defendant objected generally to the court's ruling, asserting that prospective jurors "should not have to answer those questions in front of the rest of the jury," counsel offered no particular reason suggesting that open court voir dire would not be practicable in this case. Each prospective juror completed a 27-page questionnaire, and copies were made for the court and the parties. After the court questioned the jurors who were seated in the jury box, the attorneys were given opportunities to question them further, and did so. Subsequently, during the continued nonsequestered voir dire, the court made it clear that counsel retained the opportunity to request in camera questioning in appropriate circumstances. Apparently, however, no such request was made. Under these circumstances, we have no basis on which to conclude that the trial court failed to exercise, or abused, its discretion when it implicitly found that open court voir dire was "practicable" and denied the motion for individual sequestered voir dire. (See *People v. Lewis* (2008) 43 Cal.4th 415, 493-494 (*Lewis*); *People v. Waidla* (2000) 22 Cal.4th 690, 713-714.)

Defendant insists that open court voir dire might have caused some of the prospective jurors, and sitting jurors, to become tainted by the voir dire process. He focuses first on Prospective Jurors C.H., A.M., and M.B., all of whom indicated strong support for the death penalty in their respective responses in their written questionnaires. As defendant observes, after being informed that service on the jury required that all must keep an open mind and follow the law, regardless of personal beliefs, each prospective juror later affirmed an ability to do just that. Ultimately, after defendant's "for cause" challenges to these prospective jurors were denied, defendant exercised peremptory challenges to remove all three prospective jurors. He

14

now asserts that the open court voir dire process served to "educate" all three prospective jurors concerning how to tailor their responses, or even conceal their true views, in order to avoid a successful "for cause" challenge. The People assert that "it is just as likely that the written responses were ill-conceived or badly written reflections of the true beliefs that surfaced on voir dire." We agree with the People that defendant's objection is unduly speculative.

Defendant also focuses on three jurors who ultimately sat on his case, S.T., A.Y., and H.C. He asserts they became tainted and biased against him because they were "exposed" during nonsequestered oral voir dire to the strong pro-death-penalty opinions of various other prospective jurors. Again we agree with the People: Even assuming that such exposure amounts to cognizable injury — a very doubtful proposition — because defendant failed to challenge any of the three jurors, or even exercise an available peremptory challenge, he did not preserve this claim for appellate review.

## B. *Excusal of a juror for cause*

Defendant asserts the trial court improperly excused a prospective juror, J.A., for cause based on her opposition to the death penalty.

A juror may be challenged for cause based on his or her views concerning capital punishment only if those views would prevent or substantially impair the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Thomas, supra,* 53 Cal.4th at p. 790; *People v. Stewart* (2004) 33 Cal.4th 425, 440-441 (*Stewart*), citing *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) As we recently explained, "[e]ven if the prospective juror has not expressed his or her views with absolute clarity, the juror may be excused if 'the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' [Citation.] If, after reasonable examination, the

15

prospective juror has given conflicting or equivocal answers, and the trial court has had the opportunity to observe the juror's demeanor, we accept the court's determination of the juror's state of mind." (*Thomas, supra,* at p. 790; see *People v. Pearson* (2012) 53 Cal.4th 306, 327-328, and cases cited.)

The instructions to the questionnaire given to all prospective jurors directed: "If you do not understand a question, please place a large question mark (?) in the space provided for an answer." Prospective Juror J.A. responded to relatively few questions in the 27-page juror questionnaire.[5] She responded to almost none of the questions concerning the death penalty. For example, she left question marks, or no response, concerning the following questions: "Would you please tell us how you feel about the death penalty?"; "Does the death penalty help society?"; "What kind of

---

[5] Prospective Juror J.A. answered a number of basic questions — indicating, for example, that she was 60 years of age, had six children, had completed school through eighth grade, and was employed in "food service" at public school. Unlike most other prospective jurors, however, J.A. placed many question marks throughout her form, including to questions such as "What do you feel is the most important contribution you can make to your children's lives?"; "Do you feel that your family and social experiences as a child affect your later adult behavior?"; "If the judge gives you an instruction in law and it differs with your beliefs or opinions, how will you deal with that conflict?"; "You have had an opportunity to briefly observe the defendants in this case. How would you describe them?"; "Do you feel you can be completely unbiased in this case?"

To further questions, Prospective Juror J.A. gave the following answers: "What thoughts or feelings do you have at the prospect of being called upon to judge the conduct of another?" Her answer: "I can't & don't want to hear problems. Too Nerves." When asked, "Were you ever interviewed by the police?" she checked "Yes." In response to the followup question "How did you feel about that experience and what were your reasons for those feelings?" she wrote: "I keep him away from our home."

16

murders come to mind when you think of the death penalty and someone 'deserving it'?"; "Are there any murders that do not deserve the death penalty?"; "Do you feel that life in prison without the possibility of parole is a severe punishment?" The single death-penalty-related question that she answered was the last one listed on the questionnaire: "Do you feel that life in prison without the possibility of parole is more severe than the death penalty?" Given the options of "Yes," "No," and "Uncertain," she checked the last.

During oral voir dire by the court, after being advised that the case might require the jurors to determine whether to impose the death penalty, Prospective Juror J.A. conceded that she felt "scared" and that imposing a death sentence would make her feel that "I am the one who is going to be prosecuted." The court asked, "if you were a juror on a capital case, and if you had heard the evidence in the guilt phase, found an individual guilty of first degree murder with special circumstances and you considered the manner in which the crime was committed, the extent of the participation of that individual, you heard evidence about his background, about his upbringing, and after that you felt that the death penalty was appropriate, could you vote for the death penalty?" J.A. stated, somewhat unresponsively, "I'm not sure I *would*." (Italics added.) The trial court then followed up with numerous questions attempting to determine J.A's views concerning the death penalty and whether she could in fact vote to impose death in an appropriate case. J.A. denied having any moral or religious belief concerning the issue, but added that she was "not the one to judge anybody." After the court asked why J.A. wrote question marks to various inquiries addressing the death penalty on her written juror questionnaire, she responded that she did not understand most of those questions. The court asked, "Can you think of any case where you felt that the death sentence was correct?" J.A. answered "yes," but on further questioning could not name any such case. The court

asked, "In all honesty, could you ever vote for the death penalty?" Prospective Juror J.A. replied, again somewhat unresponsively, "Yes, I — yes, I would." The court clarified, "You could?" She replied, "I could."

Thereafter, the prosecutor asked: "If you were called upon to actually make the decision, that is, that you have heard the evidence, and you['re] instructed by the court with a law and told to render a decision and that decision is life without possibility of parole or death. Could you vote for the death sentence for somebody?" Prospective Juror J.A. answered, "It would be hard for me." The prosecutor emphasized that "we need to know" and "I understand it is going to be hard for you . . . . I am trying to find out is it so hard that you don't really think it is appropriate for you to do that?" J.A. explained, "I would feel guilt that a person would die because I said yes. I would carry that guilt." The prosecutor continued to probe: "What you are expressing to me is your feelings are such that you probably really couldn't with a clear consci[ence] make that decision, could you?" To this question, J.A. answered, "No."

The prosecutor challenged Prospective Juror J.A. for cause. The court stated in full: "On the last round of questions [J.A.] indicated that she would feel guilty if she were to impose a death sentence. *And that based on that guilt she couldn't*. So I am going to grant the challenge as to [J.A.]"

Defendant stresses that reluctance to impose death is a normal and expected response from many prospective jurors, and is not itself an adequate ground for exclusion for cause. As we observed in *Stewart, supra*, 33 Cal.4th 425, 446, "a prospective juror who simply would find it 'very difficult' ever to impose the death penalty, is entitled — indeed, duty bound — to sit on a capital jury, unless his or her personal views actually would prevent or substantially impair the performance of his or her duties as a juror." Moreover, "the circumstance that a juror's conscientious

18

opinions or beliefs concerning the death penalty would make it very difficult for the juror ever to impose the death penalty is not equivalent to a determination that such beliefs will 'substantially impair the performance of his [or her] duties as a juror' . . . . A juror might find it very difficult to vote to impose *the death penalty*, and yet such a juror's performance still would not be substantially impaired under *Witt*, unless he or she were unwilling or unable to follow the trial court's instructions by weighing the aggravating and mitigating circumstances of the case and determining whether death is the appropriate penalty under the law." (*Id.*, at p. 447, quoting *Witt, supra,* 469 U.S. at p. 424.) In addition, defendant stresses, J.A. asserted, first in response to questioning by the court, and then in response to a followup question by the prosecutor, that she "could" indeed vote to impose the death penalty.[6]

Defendant concludes that Prospective Juror J.A.'s responses were neither conflicting nor ambiguous, and instead that she was consistent on two key points: she could return a death sentence, and it would be "hard" for her to do so — it would make her feel "guilty." Defendant asserts that the record fails to support the trial court's conclusion that J.A. could not impose a death sentence, and that the record "at most establishes that [she] could not return a death sentence with a clear conscience." Defendant argues that J.A. never retracted nor contradicted her previous statements that she could impose a death sentence, and he asserts that her sense of guilt

---

[6] Defendant asserts that J.A.'s negative response to the prosecutor's "clear conscience" question indicated that she *could* after all follow the law and impose the death penalty if that was warranted. As noted below, the People view that response otherwise, and we agree with the People in this regard.

19

surrounding that prospect did not render her substantially impaired under the governing high court standard.

The People, focusing on Prospective Juror J.A.'s initial statement to the court that she was "not sure I would" vote for the death penalty, and her assertions that she would feel "guilt" if she voted to impose death, argue that taken as a whole, her statements were conflicting or ambiguous — and therefore we must grant normal deference to the trial court's assessment of the prospective juror's ability to follow the law. The People also argue that J.A.'s understanding of the issues surrounding death qualification appeared to be limited, and hence "when she asserted she 'could' vote for the death penalty, it is impossible to know whether she understood the distinction the court was making or whether she merely acknowledged that she could do something she believed was morally wrong."[7]

The People further assert that although Prospective Juror J.A. responded to the prosecutor's closing question — asking "you probably really couldn't with a clear consci[ence] make that decision, could you?" — by answering "No," viewing the record as a whole reveals that J.A. did not in fact mean to indicate that she *could* follow the law and impose the death penalty with a clear conscience. Instead, the People insist, when J.A. said "No," she intended to express agreement with the

---

[7]     Defendant responds: "Neither the prosecutor nor the trial judge apparently perceived a problem with [J.A.'s] comprehension; neither mentioned it as a reason for disqualifying her. There certainly is no support for the State's post-hoc insinuation that the exclusion was based on any reason other than her death penalty views." As shown *ante*, footnote 5, the responses made by J.A. on her questionnaire do seem to indicate a problem with comprehension, and indeed, J.A. told the court that she did not understand many of those death penalty questions.

prosecutor's characterization — that she could *not*, with a clear conscience, make a decision whether to impose death. Although the People complain that defense counsel made no effort to resolve this alleged ambiguity, because the burden of proof in challenging a juror for anti-death-penalty views rests with the prosecution, it was up to the prosecutor, not defense counsel, to follow up with questions that would resolve any ambiguity.**8** Nevertheless, the People insist, when viewed in context, it is apparent that Prospective Juror J.A. intended to convey that she could not make the decision whether to impose death with a clear conscience.

The People's view of the record is evidently the one implicitly embraced by the trial court, which as noted above concluded that in light of the "last round of questions [J.A.] indicated that she would feel guilty if she were to impose a death sentence. *And that based on that guilt she couldn't*." (Italics added.)

Defendant argues that it would not be proper for this court to construe Prospective Juror J.A.'s final response of "No" as signifying that she *agreed* with the prosecutor — that she "probably really *couldn't* with a clear consci[ence]" follow the law and vote to impose the death penalty if warranted. This construction, however, reflects common colloquial speech — many people, if asked, "you couldn't do that, could you?" would answer "No" if they meant to convey "No, I couldn't." Accordingly, we reject defendant's contention that J.A.'s responses concerning whether she could vote to apply the death penalty were consistent from beginning to end; the record supports a conclusion that her responses were in fact conflicting or

---

**8** Moreover, defendant observes, his counsel could reasonably have concluded that because the record appeared to show that Prospective Juror J.A. was qualified to sit as a juror, "there was no reason for [defendant's] attorney to pursue voir dire."

21

ambiguous. Furthermore, although the trial court did not state that it had considered J.A.'s demeanor when arriving at the court's conclusion (that because of her feelings of guilt "she couldn't" vote for death), we reasonably infer that the trial court reached this conclusion based on both J.A.'s demeanor and her prior responses. Accordingly, under the circumstances, we grant deference to the trial court's interpretation of J.A.'s statements and to its assessment of her state of mind that she could not impose a death sentence based on her feelings of guilt.

But was Prospective Juror J.A.'s state of mind such that it would substantially impair her ability to serve as a juror? Defendant argues that a prospective juror's stated "probable" inability to undertake the death penalty determination process with a "clear conscience" *by itself* would not constitute "substantial impairment" justifying excusal for cause. As defendant observes, we have stressed in *Stewart* that a juror's "conscientious opinions or beliefs concerning the death penalty" that would make it "very difficult for the juror ever to impose the death penalty" does not mean that "such beliefs will 'substantially impair the performance of his [or her] duties as a juror.' " (*Stewart, supra,* 33 Cal.4th at p. 447.) By the same token, defendant asserts, a juror who, as the trial court concluded here, cannot vote for death with a clear conscience, nevertheless should be deemed qualified to sit in judgment at the penalty trial so long as he or she still agrees to follow the law and vote to impose the death penalty if warranted.

We find *Stewart* distinguishable in two key respects. First, Prospective Juror J.A. expressed more than just a difficulty with imposing the death penalty. She said she felt "scared" at the prospect of sitting on a capital jury, and that she would carry "guilt that a person would die because I said yes." When the prosecutor probed those comments, J.A. agreed that she "probably really couldn't with a clear consci[ence] make that decision" to vote for a death sentence. Considering this record as a whole, the trial court was within

22

its discretion to conclude that J.A. would be substantially impaired in her ability to serve on a capital case.

Second, the trial court in *Stewart* excused prospective jurors based solely on their answers to a written question concerning whether their death penalty views would " 'prevent or make it very difficult' " to determine the appropriate penalty, and without engaging in oral voir dire. (*Stewart, supra,* 33 Cal.4th at pp. 444, 446-447.) Our decision emphasized that "a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record" (*id.* at p. 451), and we observed: "Had the trial court conducted a follow-up examination of each prospective juror and thereafter determined (in light of the questionnaire responses, oral responses, and its own assessment of demeanor and credibility) that the prospective juror's views would substantially impair the performance of his or her duties as a juror in this case, the court's determination would have been entitled to deference." (*Ibid.*; see *People v. Avila* (2006) 38 Cal.4th 491, 529 [trial court has opportunity to assess prospective juror's demeanor and tone of voice].)

Here there was such a followup examination. The court and the prosecutor extensively questioned Prospective Juror J.A. orally, and the court considered both her answers and her demeanor in excusing her for cause. We distinguished *Stewart* on this same basis in *People v. Tate* (2010) 49 Cal.4th 635, in which the defendant argued that a juror's mere difficulty in imposing the death penalty is not a valid basis for excusal. We observed that the trial court had engaged the juror in oral voir dire, and held: "Under such circumstances, a juror's conflicting or ambiguous answers may indeed give rise to the court's definite impression about the juror's qualifications, and its decision to excuse the juror deserves deference on appeal." (*Id.* at p. 674, fn. 22; see *People v. Thomas*

23

(2011) 52 Cal.4th 336, 360 [distinguishing *Stewart*]; *People v. Lancaster* (2007) 41 Cal.4th 50, 80 [same].)

For these reasons, we conclude that the record supports a conclusion that Prospective Juror J.A. was indeed substantially impaired because, based on her feelings of guilt, she could not impose a death sentence, and hence the trial court did not err in granting the excusal for cause.

### III. GUILT PHASE ISSUES

#### A. *Sufficiency of the evidence to establish attempted robbery and the related special circumstance*

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) There was no actual robbery with regard to Raymond Shield, but an attempt to commit a robbery is itself a crime, and is punishable as such under section 213, subdivision (b). As noted, defendant was charged with, and convicted of, attempted robbery of Shield. In order to constitute such an attempt, the prosecution was required to prove (1) the specific intent to commit robbery, and (2) an act — described in section 21a as a "direct but ineffectual act done toward its commission."[9]

At the close of the prosecution's case-in-chief, defendant moved under section 1118.1[10] for entry of judgment of acquittal on the ground that the evidence then

---

[9] Section 21a provides: "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."

[10] Section 1118.1 provides in full: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either

*(footnote continued on next page)*

24

before the court was insufficient to sustain a conviction concerning that charge and the corresponding special circumstance allegation on appeal. The trial court summarily denied the motion. Thereafter, after the verdict, defendant moved for a new trial (§ 1181, subd. 6) on grounds including asserted insufficiency of the evidence of attempted robbery, and the trial court denied that motion as well. Defendant now asserts that in each instance the trial court erred, because the prosecution's evidence failed to prove the elements of attempted robbery (that defendant specifically intended to take property from Shield by force or fear, and committed a direct act toward that goal) beyond a reasonable doubt. Invoking the standard set forth in *Jackson v. Virginia* (1979) 433 U.S. 307, 319, defendant asserts the evidence presented at the guilt phase as a whole was insufficient to support a conviction of attempted robbery, and hence the attempted robbery conviction must be reversed.

In considering whether the trial court erred in failing to grant the motion for judgment of acquittal under section 1118.1 with regard to attempted robbery, we ask whether "there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged."

---

*(footnote continued from previous page)*

side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

(*People v. Mendoza* (2000) 24 Cal.4th 130, 175.)[11]  When, as here, the motion under section 1118.1 was made "at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point" in the trial (*People v. Trevino* (1985) 39 Cal.3d 667, 695) — in other words, based on the prosecution's case alone, and without considering the evidence subsequently adduced during the presentation of the defense case or evidence produced by the prosecution on rebuttal.[12]

In assessing such a claim, we review the record "in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  "The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

---

[11]  The same standard of review applies when a defendant asks the trial court to review the legal sufficiency of the evidence after the jury has returned its verdicts. (*People v. Hatch* (2000) 22 Cal.4th 260, 268-269.)  We have since clarified that a defendant seeking to challenge the legal sufficiency of the evidence in the trial court after the case has been submitted to the jury should not move for a new trial under section 1181, subdivision 6, but should instead invite the court's dismissal under section 1385.  (*Hatch, supra*, at pp. 268-271; *Porter  v. Superior Court* (2009) 47 Cal.4th 125, 133.)

[12]  We separately consider *post,* at footnote 14, the question of sufficiency of evidence raised in the postverdict motion for a new trial under section 1181, subdivision 6.

of fact could have found the essential elements of the crime beyond a reasonable doubt.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)"  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*).)

Moreover, as observed in *Rodriguez*:  "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  (*People* v. *Stanley* (1995) 10 Cal.4th 764, 792.)  ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.  ' "*If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.*" ' [Citations.]" ' [Citation.]"  (*Rodriguez, supra,* 20 Cal.4th at p. 11, italics added; see generally *People v. Clark* (2011) 52 Cal.4th 856, 942-943 (*Clark*), and cases cited.)

We turn to defendant's assertion that the evidence presented by the prosecution in its case-in-chief, and considered by the trial court at the time it ruled on his motion under section 1118.1 for a judgment of acquittal with regard to attempted robbery, was insufficient to prove either required element:  (1) specific intent to rob Shield, or (2) a direct act toward robbing Shield.

1. *Intent*

The People assert that because the evidence introduced in their case-in-chief showed that defendant and Martin robbed three victims with the use of a gun immediately before arriving at the Holiday Inn, and that defendant and Martin robbed another victim using that same gun shortly after leaving the Holiday Inn, the evidence demonstrated that defendant was on a robbery spree and "arrived at the Holiday Inn

27

with the intent of finding another robbery victim" — and that defendant settled on Mr. Shield and his family. Defendant asserts that the evidence was insufficient to prove that he had focused his intent on Mr. Shield or his family in particular, and that the evidence suggested that defendant and Martin were simply on the lookout for robbery victims generally.

We disagree. The evidence showed that defendant and his cousin acquired a gun, discussed committing robberies and then started committing them. After stealing a driver's truck and the passenger's property, they selected a victim at the bus station. When they learned he was traveling they observed that he "must have some money," of which they relieved him at gunpoint. Within minutes they drove to the Holiday Inn, where they saw a man unloading suitcases from a car, apparently traveling like their last victim. Defendant pulled up next to Mr. Shield's car under the hotel's covered entrance driveway, then got out of the stolen truck and opened the hood, pretending to have car trouble. Based on this record, we agree with the People that the evidence was sufficient to support the conclusion by reasonable jurors that defendant had focused on and intended to rob Mr. Shield or his family.

2. *Overt act*

The overt act element of attempt requires conduct that goes beyond "mere preparation" and "show[s] that [defendant] is putting his or her plan into action." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8 (*Decker*); see, e.g., *People v. Toledo* (2001) 26 Cal.4th 221, 230 ["Under the provisions of section 21a, a defendant properly may be found guilty of [an attempt crime] whenever, acting with the specific intent to commit the offense . . . , the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action."] see also CALJIC No. 6.00 ["Mere preparation . . . is not sufficient to constitute an

28

attempt."] CALCRIM No. 460 [requiring a "direct step" that "goes beyond planning or preparation and shows that a person is putting his or her plan into action"].)

We repeatedly have acknowledged — most recently, in *Decker, supra*, 41 Cal.4th 1 — that the line between mere preparation and conduct satisfying the act element of attempt often is difficult to determine; the problem "is a question of degree and depends upon the facts and circumstances of a particular case." (*Id.*, at p. 14.) The act that goes "beyond mere preparation" need not constitute an element of the target crime (*People v. Dillon* (1983) 34 Cal.3d 441, 453-454 (*Dillon*)), and it " 'need not be the ultimate step toward the consummation of the design.' " (*People v. Memro* (1985) 38 Cal.3d 658, 698.) Instead, " 'it is sufficient if [the conduct] is the first or some subsequent act directed towards that end after the preparations are made.' " (*Ibid.*) In other words, we have explained, the act must represent " 'some appreciable fragment of the crime.' " (*Ibid.*; see *Dillon, supra,* at p. 454.)

We briefly review cases in which we, and our Courts of Appeal, have found sufficient evidence of the act element of attempted robbery.

*People v. Anderson* (1934) 1 Cal.2d 687, concerned the attempted robbery of the ticket office attendant of the Curran Theater in San Francisco, resulting in the shooting death of the attendant. Our analysis carefully distinguished between "mere acts of preparation," on one hand (*id*., at p. 690), and subsequent conduct that "passed far beyond the preparatory stage and constituted direct and positive overt acts" establishing attempted robbery. (*Ibid*.) As we explained, although the defendant admitted that he intended to rob the ticket office attendant (and hence in that case, the intent element of criminal attempt was clearly shown and not in dispute), his act of "concealing the gun on his person and going to the general vicinity of the Curran theater with intent to commit robbery" constituted "mere acts of preparation." (*Ibid*.) And yet, when the defendant *approached the ticket office and pulled out his gun* when

29

he was approximately two feet from the office window (and thereafter, accidentally or otherwise, fired the gun), this constituted a direct, albeit ineffectual, act toward the intended robbery, satisfying the act element of attempted robbery.  (*Ibid*.)

In *Dillon, supra,* 34 Cal.3d 441, the evidence showed that the defendant and seven others, armed and disguised, set off on foot for a marijuana farm, which they knew from recent prior experience was protected by a farmer with a shotgun.  On appeal from a resulting homicide conviction premised upon attempted-robbery felony-murder, we found substantial evidence from which a reasonable jury could have found sufficient acts beyond mere preparation for robbery.  The defendant and his group had passed barricades posted with "no trespassing" signs, and arrived on the scene with guns, knives, clubs, masks, rope, and strips of sheeting.  After noticing armed guards patrolling the crop, they broke into four groups of two, encircled the field, and awaited an opportunity to carry out the intended robbery.  The robbery was aborted only because one member of the defendant's group accidentally discharged his rifle, alerting a guard who subsequently confronted the group, and who was then shot and killed by the defendant.  Although the "defendant did not actually encroach on the marijuana field," his actions, we observed, "went beyond mere preparation." (*Id*., at p. 456.)

Also illustrative is a Court of Appeal decision, *People v. Vizcarra* (1980) 110 Cal.App.3d 858.  In that case the defendant was observed standing on a four-foot-wide walkway just outside a liquor store late at night, wearing a poncho.  A customer walked past and noticed that the defendant immediately turned his face to the wall so that his nose was against the wall, and the customer also observed the butt of a rifle protruding from the defendant's poncho.  The defendant then immediately left the walkway and went to his car, which he had parked across the street.  The appellate court concluded that these facts — parking very nearby (which would facilitate a

30

speedy departure from the scene), approaching within a few feet of the front of the liquor store with a partly concealed rifle, and attempting to hide by turning to the wall when observed by a customer — constituted sufficient direct actions toward robbing the liquor store.

With these and related cases in mind, the People argue, first, that the conduct of defendant and Martin — consisting of driving the stolen truck into the Holiday Inn's covered entrance driveway, parking, and then immediately getting out of the truck to open the hood — constituted a ruse to lure the victim to them so that they could rob him. This, the People suggest, amounted to a direct act — an appreciable fragment of the crime that went beyond mere preparation — sufficient to establish attempted robbery of Raymond Shield. The People assert that "when defendant, by this ruse, caused Mr. Shield to walk over to [him] and Martin, the preparation stage was over. All that remained was to make the robbery demand."

In response, defendant cites *People v. Buffum* (1953) 40 Cal.2d 709, 718, and related cases, for the proposition that the conduct necessary to establish attempted robbery "must not be equivocal in nature," and he asserts that the actions relied upon by the People were equivocal in nature. We conclude the evidence was sufficient to support a finding by the jury that defendant and Martin unequivocally engaged in a deliberate ruse to lure Mr. Shield to a place where, just outside the view of his family, they continued their early-morning mission of trying to rob victims they found along their way, by demanding property from Mr. Shield by their words or actions.

The People additionally emphasize that immediately after the three men left the area behind the truck hood, defendant, who had quickly gone back inside the truck, shot Mr. Shield as he hurriedly walked back toward his family. The People assert that a reasonable juror could have inferred from this that some kind of act in furtherance of robbery — a demand for money or display of the gun — must have

31

occurred behind the hood of the truck.[13]  The People acknowledge in their brief that it is "possible that Mr. Shield retreated for reasons other than [defendant's] having demanded money," but they assert that "the reasonable inference is otherwise."

Defendant insists that such an inference would have been unduly speculative, and hence unreasonable.  He emphasizes that although reasonable inferences may constitute substantial evidence in support of a conviction, and that although we are obligated to view the facts in the light most favorable to the judgment and avoid second-guessing inferences that could reasonably be drawn by jurors, " '[a]n inference is not reasonable if it is based only on speculation.' " (*People v. Hughes* (2002) 27 Cal.4th 287, 365 (*Hughes*).)  Moreover, he cautions, although the evidence may raise a suspicion that acts of attempted robbery occurred while the three men stood behind the truck hood, as we observed in *People v. Redmond* (1969) 71 Cal.2d 745, 755, evidence that "merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction.  Suspicion is not evidence . . . ."

We conclude that on the facts presented, defendant's conduct was sufficient to support a conclusion by the jurors that some act in furtherance of robbery must have occurred, unseen by members of the Shield family, behind the hood of the truck.  As noted, defendant committed three completed armed robberies within a few hours of the charged attempted robbery, displaying a gun in each; he parked the stolen truck in

---

[13]    In argument to the jury, the prosecutor asserted that the evidence was "consistent with, 'Buddy, give me your money' or 'this is a robbery,' or some other words to let him know what they were doing there.  [Defendant] [s]howed him the gun, [and said] 'I want your wallet.'  [¶]  We will never know what was said, but inferentially we can figure what type of information, what message was being given there, [it must have been] 'This is a robbery.' "

32

a place and in a manner well suited to attract potential victims and to provide concealment, opening the hood even though the truck was functioning properly; and Mr. Shield, after noticing defendant's wave and joining him and Martin behind the hood of the truck, then hurried away as if something were wrong. Finally, the jury reasonably could have concluded that defendant's subsequent act of pulling the "heavy" trigger and discharging a single shot into Mr. Shield's arm and abdomen as he was walking away, suggested consciousness of guilt following consummation of a robbery attempt.

It follows that the trial court did not err in denying defendant's motion for acquittal under section 1118.1 with regard to attempted robbery.[14] In light of our

---

[14] Nor did the trial court err in similarly denying defendant's postverdict motion for a new trial (§ 1181, subd. 6) challenging the sufficiency of the evidence. Defendant claims that, taking into account his testimony, there was no substantial evidence that an attempted robbery occurred. Defendant's own testimony confirmed a general intent to look for robbery victims on the morning in question, even though he expressly disclaimed any intent to rob Mr. Shield or members of his group and also asserted that the hotel's entrance driveway area was too well lighted to serve his purposes. With regard to the act element, defendant testified that in response to Mr. Shield's making eye contact with him while he stood at the open hood of the truck, he had waved "hi" to Mr. Shield, in order not to look "too suspicious." Finally, defendant testified that he is left-handed, and that the gun discharged from his right hand.

The jury, of course, was not obligated to credit any of these aspects of defendant's testimony. (See *People v. Hatch, supra*, 22 Cal.4th at p. 272 [when a defendant challenges a verdict on the ground of legal insufficiency, the trial court "must review 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt' "].) With regard to the intent element of attempted robbery in particular, the jury reasonably could conclude that defendant's assertion that he was looking for a solitary victim, and that the lighting was too bright at the hotel's covered entrance driveway, was inconsistent

*(footnote continued on next page)*

conclusion that the evidence was sufficient to support the charge of attempted robbery, we also reject defendant's related claim that the evidence was insufficient to prove the robbery-murder special circumstance, section 190.2, subdivision (a)(17)(A).

B. *Failure to specifically charge first degree murder and to require unanimous agreement on a particular theory of first degree murder*

Defendant complains that the prosecution charged him with murder in violation of section 187, subdivision (a), rather than specifying first degree murder under section 189, and asserts that the prosecution was therefore limited to proving second degree murder. As he acknowledges, we considered and rejected the same arguments in *Hughes, supra,* 27 Cal.4th at pages 368-370, and *People v. Nakahara* (2003) 30 Cal.4th 705, 712 (*Nakahara*), and we see no reason to reconsider.

It is clear from the record that defendant received adequate notice that the prosecution was attempting to prove first degree murder, and of its theory in support of that offense. At the time of the preliminary hearing, defendant knew that the prosecution was pursuing a special circumstance finding premised on the attempted robbery of Mr. Shield. The second amended information specifically alleged under section 190.2, as a special circumstance, that the murder was committed in the course

---

*(footnote continued from previous page)*

with the facts in the other cases. The carjacking involved two young male victims and took place in the "fairly well lit" parking lot of an open market. The male bus station victim described the area as "very well lit." The last offense was the daytime robbery of an open business. Further, the jury could have concluded that if defendant had merely intended to "watch and wait," he could easily and more safely have done so from somewhere else in the parking lot, rather than by parking almost in front of the hotel door and drawing further attention by raising the truck's hood.

of the attempted robbery of Mr. Shield — thereby providing notice that the prosecution was attempting to prove first degree murder. Indeed, defendant moved unsuccessfully to dismiss that special circumstance allegation. Moreover, well before trial, the prosecution announced its intention to seek the death penalty — again, a sentence that was legally predicated on a first degree murder conviction.

Defendant also asserts the trial court erred (1) by not instructing the jury that it must unanimously agree on a particular theory of first degree murder — premeditation and deliberation or felony murder — and (2) by instead, over his objection, giving the People's proposed instruction to the contrary: "For the jury to return a verdict of first degree murder as to any defendant it is not necessary that all jurors agree on the same theory of first degree murder." We repeatedly have held that no instruction requiring such unanimity is required, and that it is sufficient that the jury be directed that it must find proof " 'beyond a reasonable doubt of the single offense of first degree murder as defined by statute.' " (*People v. Moore* (2011) 51 Cal.4th 386, 413; accord, *People v. Pride* (1992) 3 Cal.4th 195, 249; see also *Nakahara, supra,* 30 Cal.4th at p. 712 ["although the two forms of murder have different elements, only a single statutory offense of murder exists" and "need not be separately pleaded"].) The challenged instruction was proper.

C. *Sufficiency of the evidence to prove*
*first degree murder*

The jury was instructed that it could find defendant guilty of first degree murder based upon either (1) a felony murder theory, premised on attempted robbery, or (2) a theory of premeditated and deliberate murder.**15**

In light of our conclusion that the evidence was sufficient to support the charge of attempted robbery, we reject defendant's related claim that the evidence was insufficient to prove murder on a felony murder theory. Nor do we find that the evidence presented to the jury was insufficient to support a determination of premeditated and deliberate murder. (See, e.g., *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [identifying three factors commonly present in cases of premeditated and deliberated murder: planning activity, motive, and manner of killing]; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1081 (*Koontz*) [applying the three factors and noting that they reflect a " 'framework' " for " 'assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations' "].)

As we have often observed, " '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . . ." [Citations.]' [Citation.]" (*Koontz , supra*, 27 Cal.4th at p. 1080.) We find sufficient

_____

**15** The jury also was instructed on second degree murder and involuntary manslaughter, but in light of its first degree murder determination, did not return verdicts on those charges.

evidence of planning (carrying the loaded, concealed pistol to the position behind the hood of the truck), motive (to effectuate a robbery or its attempt by killing the victim-witness, or simple revenge because Mr. Shield did not relinquish money) and a manner of killing indicative of intent to kill (a shot fired from a pistol with a heavy trigger pull, which hit the victim's elbow and abdomen as the victim walked quickly away). Viewed as a whole, the evidence supports a finding of premeditated and deliberate murder.

D. *Instructions on consciousness of guilt*

Defendant asserts the court erred in giving three standard instructions on consciousness of guilt (CALJIC Nos. 2.03 ["Consciousness of Guilt — Falsehood"] 2.06 ["Efforts to Suppress Evidence"], and 2.52 ["Flight After Crime"]), and that these alleged instructional errors denied him due process, a fair trial, a jury trial, and equal protection, as well as reliable jury determinations of guilt, the special circumstance, and penalty under the federal and state Constitutions.

Each challenged instruction made clear that the jury "may" consider certain described conduct as a circumstance tending to prove consciousness of guilt, but each also cautioned that such conduct is not sufficient by itself to prove guilt, and that the weight or significance of the conduct, if any, constituted matters for the jury's consideration.

CALJIC No. 2.06, as modified, permitted the jurors to infer consciousness of guilt if they found that defendant "attempted to suppress evidence against himself in any manner, such as concealing evidence *or refusing to stand in a lineup . . . .*" This instruction was supported by evidence that (1) defendant or Martin, after fleeing Steve's Market, hid the gun they had used in a crack in a brick wall; and (2) defendant thereafter refused to stand in a lineup. Focusing solely on the second basis for the instruction, defendant now asserts that it "equated the refusal to stand in a lineup with

37

suppression of evidence, thereby removing this factual determination from the jury." Defendant insists that he had a valid reason for declining to stand in the lineup: He told the police that he was aware he had been photographed by them, and he was concerned that those photos had been shown to persons who would witness any lineup. According to defendant, "the jury could have found that his refusal was not an attempt to suppress evidence, and therefore, did not show consciousness of guilt. However, given the directive that the refusal to stand in the lineup was an attempt to suppress evidence, the jury was unlikely to have understood that it was free to reject the instruction's inference." We reject defendant's characterization of the instruction as a directive that the refusal to stand in the lineup was in fact an attempt to suppress evidence. The instruction merely clarified the permissible use of certain evidence if the jury found the evidence to be true.

A defendant's refusal to participate in a lineup is admissible evidence supporting an inference of consciousness of guilt. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1235.) We agree with the People that "the mere fact that [defendant] had voiced a reason for his refusal did not require the court to make a specific finding that [defendant's] excuse was credible. Nor was the court obliged to find that [defendant's] professed reason for nonparticipation eliminated a reasonable inference of consciousness of guilt." Clearly there was "*some evidence* in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102, italics added (*Coffman and*

*Marlow*).)**16** Defendant remained free, however, to argue to the jury that his refusal to stand in the lineup did not, in fact, reflect consciousness of guilt.

Defendant challenges two additional consciousness of guilt instructions. CALJIC No. 2.03, covering "a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried," was supported by evidence that defendant gave a false name ("Jeffrey Scott") upon arrest. CALJIC No. 2.52, permitting the jury to infer consciousness of guilt based on "the flight of a person immediately after the commission of a crime," was supported by evidence that defendant and Martin indeed fled from each of the four crime scenes.

Defendant acknowledges that we repeatedly have approved use of such instructions in analogous circumstances. (E.g., *People v. McWhorter* (2009) 47 Cal.4th 318, 377; *People v. Crew* (2003) 31 Cal.4th 822, 848-849 [CALJIC No. 2.52 and a related consciousness of guilt instruction were supported by sufficient evidence and did not constitute improper "pinpoint" instructions]; see also *People v. Geier* (2007) 41 Cal.4th 555, 589 [" '[t]he inference of consciousness of guilt from willful falsehood or fabrication or suppression of evidence is one supported by common sense, which many jurors are likely to indulge even without an instruction' "].) He urges us to reconsider, but we see no basis to do so.

Defendant insists that it would be irrational for a jury to infer from defendant's general consciousness of guilt that he also had the requisite mental state for attempted

---

**16**      Although defendant does not press the point, we note that the evidence that either defendant or Martin hid the gun after fleeing Steve's Market also amply supported the instruction. (*People v. Visciotti* (1992) 2 Cal.4th 1, 61 [such an instruction is proper even if the evidence showed that the codefendant, acting on behalf of and with the encouragement of the defendant, concealed the weapon].)

robbery of Raymond Shield, and for first degree murder of Shield. As noted earlier, however, each instruction made clear that the jury was simply *permitted* to consider the described conduct as tending to prove a consciousness of guilt. Each instruction also cautioned that such conduct is not by itself sufficient to prove guilt — and that the weight or significance of the conduct, if any, constituted matters for the jury's consideration. Moreover, each instruction "told the jury only that [the conduct] may bear on 'consciousness of *guilt* (italics added); a reasonable jury would understand this phrase to mean only 'consciousness of some wrongdoing,' not consciousness of each and every element of the charged offense." (*People v. Arias* (1996) 13 Cal.4th 92, 142, quoting *People v. Crandell* (1988) 46 Cal.3d 833, 871; see *Crandell*, at p. 871 ["The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto."].)

We conclude that the court did not err in giving the challenged consciousness of guilt instructions.

### E. *Instructions on motive and circumstantial evidence*

Defendant advances a number of meritless objections to various other standard guilt phase instructions.

#### 1. *Motive*

The trial court instructed the jurors pursuant to CALJIC No. 2.51 (5th ed. 1988), as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled."

Defendant claims this instruction violated his rights to a fair trial, due process and a reliable verdict in a capital case. He asserts that the instruction (1) implied that evidence of motive is sufficient by itself to prove guilt because the instruction did not specify that motive alone was insufficient; (2) lessened the prosecution's burden of proof; and (3) shifted the burden of proof to defendant to prove his innocence.

We considered and rejected defendant's arguments in *People v. Cleveland* (2004) 32 Cal.4th 704 (*Cleveland*). We held that the instruction merely informs the jury that it may consider motive when weighing the evidence, and does not shift the burden from the prosecution and onto the defendant. (*Id.*, at p. 750; see *People v. Taylor* (2010) 48 Cal.4th 574, 632 (*Taylor*).) Here, as in *Cleveland*, the trial court, in addition to giving the challenged motive instruction, properly instructed the jury under CALJIC No. 2.90 that guilt must be proved beyond a reasonable doubt. (*Cleveland, supra,* at p. 750.) Also, as in *Cleveland*, "[w]e find no reasonable likelihood [that] the jury would infer from the motive instruction that motive alone could establish guilt" — or that the instruction lessened the prosecution's burden of proof, or shifted the burden of proof to him. (*Ibid.*)

2. *Circumstantial evidence and related instructions*

In addition to giving the jury the standard reasonable doubt instruction, the trial court also read to the jury the standard circumstantial evidence instructions, CALJIC Nos. 2.01 ("Sufficiency of Circumstantial Evidence — Generally"), 2.02 ("Sufficiency of Circumstantial Evidence to Prove Specific Intent or Mental State"), 8.83 ("Special Circumstances — Sufficiency of Circumstantial Evidence — Generally"), and 8.83.1 ("Special Circumstances — Sufficiency of Circumstantial Evidence to Prove Required Mental State"). Defendant asserts these instructions undermined the constitutional requirement that guilt be proved beyond a reasonable doubt.

41

We disagree.  The instructions were supported by the evidence and these constitutional claims have previously been rejected by this court.  (See *Hughes*, *supra*, 27 Cal.4th at p. 346; *People v. Kipp* (1998) 18 Cal.4th 349, 374-375; *Koontz, supra,* 27 Cal.4th at pp. 1084-1085.)  Although defendant asks us to reconsider, he advances no persuasive reason to do so.

Defendant also asserts that other standard given instructions — CALJIC Nos. 1.00 ("Respective Duties of Judge and Jury" ), 2.21.1 ("Discrepancies in Testimony"), 2.21.2 ("Witness Willfully False"), 2.22 ("Weighing Conflicting Testimony"), 2.27 ("Sufficiency of Testimony of One Witness"), 2.51 ("Motive"), and 2.52 ("Flight After Crime") in combination "vitiated" the reasonable doubt standard and instruction.  Again, we have rejected these claims in the past (*Cleveland*, *supra*, 32 Cal.4th at p. 750), and we are presented no persuasive reason to do otherwise now.

F.  *Alleged misconduct by the prosecutor during*
*cross-examination of defendant*

During direct examination, defendant testified that he was "very sorry" for having killed Mr. Shield, and that because he could imagine his own loss if someone had shot his own mother, he was deeply affected by the testimony of the victim's daughter, Pamela Joyce Coryell.  In response to these expressions of remorse, the prosecutor asked defendant on cross-examination why he had been seen "laughing and carrying on" when outside the jury's presence.  Defense counsel objected, arguing that defendant's laughter outside the jury's presence was simply a normal mechanism for releasing tension and reflected nothing else.  The court sustained defense counsel's objection to the prosecutor's question on evidentiary grounds, ruled the inquiry barred under Evidence Code section 352, struck the prosecutor's question, and admonished the jury to disregard the question and any answer.

42

Later on cross-examination, in response to the prosecutor's questions concerning defendant's testimony that he and Martin had decided to "try one more robbery" after the unsuccessful Holiday Inn incident, defendant at one point explained that they "decided to probably rob this place, get one more shot . . . ." The prosecutor remarked — and then repeated: "No pun intended?" Defense counsel stated, "Your honor, I think he has made his point" — to which the court responded, "Next question, counsel."

Defendant claimed in his unsuccessful motion for a new trial that both of these incidents constituted prejudicial misconduct. He reasserts those claims on appeal as violations of his constitutional rights to due process, a fair trial, confrontation and cross-examination, and reliable, nonarbitrary determinations of guilt and penalty under the federal and state Constitutions.

In rejecting defendant's new trial motion, the trial court reasoned that the prosecutor's questioning about defendant's laughter constituted permissible impeachment concerning the genuineness of defendant's professed remorse. In any event, the court reasoned, it was nonprejudicial in light of the trial court's evidentiary ruling and admonition to the jury to disregard the question and answer. The trial court also noted that in view of its own observations of defendant's "inappropriate" demeanor "in and out of the presence of the jury," the prosecutor had a "good faith basis" for engaging in that line of questioning.

Improper comments by a prosecutor require reversal of a resulting conviction when those comments so infect a trial with unfairness that they create a denial of due process. (*Clark*, *supra*, 52 Cal.4th at p. 960; *People v. Earp* (1999) 20 Cal.4th 826, 858 (*Earp*), and cases cited.) Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury. (*Earp, supra,* at p.

858.)  In order to preserve such claims for appellate review, as a general matter the defendant must object below and request an admonition, if an admonition would have cured the harm caused by the misconduct.  (*Ibid.*)

With regard to the prosecutor's comments concerning defendant's demeanor during trial but outside the jury's presence, as the People observe, defendant testified and, in doing so, put his contemporaneous feelings of remorse at issue.  Moreover, the court recounted that it had observed defendant's inappropriate demeanor both in and outside the jury's presence.  Accordingly, because the court found that the prosecutor's question was posed in good faith and the prosecutor sought to explore defendant's testimony about remorse for having killed Mr. Shield, the prosecutor did not commit misconduct.  In any event, the question did not infect the trial with such unfairness as to result in a denial of due process (see *Earp, supra,* 20 Cal.4th at p. 858, and cases cited) and there is no reason to doubt that the court's admonition adequately cured any harm.  (*People v. Elliot* (2012) 53 Cal.4th 535, 554-555; *People v. Tate, supra,* 49 Cal.4th at pp. 688-689; cf. *People v. Coddington* (2000) 23 Cal.4th 529, 631; *People v. Montiel* (1993) 5 Cal.4th 877, 915.)

Finally, with regard to the "no pun intended" remark, defendant forfeited any claim by failing to object and seek an admonition.  In any event, the remark, even if misconduct, was nonprejudicial in light of the undisputed evidence that defendant shot Mr. Shield.

IV.  PENALTY PHASE ISSUES

A.  *Alleged misconduct by the prosecutor during the penalty phase trial*

Under section 190.3, factor (b), criminal activity by a defendant involving the use of violence is a statutory aggravating factor that the jury must consider when deciding whether to impose the death penalty.  As mentioned previously, the

44

prosecution presented three examples of such uncharged postarrest conduct by defendant.  When examining witnesses at the penalty phase trial concerning the first two of those events, described *ante*, part I.D. — the county jail dorm fight in which defendant and other Black inmates fought a group of Hispanic inmates, and the June 1991 attack by defendant and four other inmates on Russell Cross, after Cross sat on the bunk of a Black inmate — the prosecutor elicited testimony from witnesses that those two attacks appeared to be racially motivated.  Defendant now characterizes this as an irrelevant and inflammatory interjection by the prosecutor, designed to imply to the "white and Hispanic jury" that the underlying charged offenses were themselves racially motivated, and thereby to insert racial animosity into the penalty trial.

Defendant failed to object to this cross-examination or seek an appropriate admonition at the time, but quite soon after — at the commencement of the afternoon session following the now challenged cross-examination and testimony — he moved for a mistrial, contending that the prosecutor had attempted to prejudice the jury by his cross-examination.  The trial court denied the motion.  We agree with defendant that the claim is not forfeited.

The People assert that "the prosecutor merely adduced unobjectionable eyewitness testimony that when [defendant] took active part in two postarrest violent attacks on jail inmates, those attacks appeared to be racially motivated.  That testimony was relevant to explain the circumstances of the attacks and [defendant's] motive for the assaults" — neither of which, the People argue, "would make sense without that information."

Certainly section 190.3, factor (b) did not bar the prosecution from eliciting evidence of the circumstances surrounding the criminal violence, or limit the prosecution to presenting merely the bare facts of the criminal violence.  (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1377 [noting that "the issue of other violent

45

criminal activity encompasses not only the existence of such activity but also all the pertinent circumstances of that activity" and that it is appropriate for the prosecution to place evidence of violent criminal activity into context].)[17]  We find no misconduct.

### B. *Death sentence for "felony murder simpliciter" and alleged violation of international law*

Defendant notes that his eligibility under California law for the death penalty hinges on his conviction of felony murder and the related robbery-murder special circumstance.  He observes that under state law, a defendant who is convicted of murder during the commission or attempted commission of robbery may be executed even if the killing was unintentional or accidental — which, as noted earlier, he claims the killing in this case was.  He asserts that the Eighth Amendment to the federal Constitution, and international law, both require additionally a finding that he killed with some culpable state of mind, such as intent to kill or at least recklessness, before he can be subjected to the death penalty.  Defendant notes that only five states allow capital punishment for a felony murderer without regard to his or her state of mind, and argues that the possibility he killed accidentally renders the death penalty disproportionate and unconstitutional.

---

[17]     Defendant's related contention that the prosecutor's conduct violated international law fails because (1) " '[i]nternational law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements' " (*People v. Brown* (2004) 33 Cal.4th 382, 404 (*Brown*), and (2) we find no such state or federal law defect in this case. (See *Taylor, supra,* 48 Cal.4th at p. 661; *Brown,* at pp. 403-404.)

We have long recognized that imposition of a death sentence premised on felony murder, in circumstances in which, as here, the defendant is the actual killer, is indeed constitutional. (E.g., *Taylor*, *supra*, 48 Cal.4th at p. 661 [when a defendant is charged with special circumstance felony murder, the prosecution need prove neither "intent to kill nor reckless indifference to life" as a required element of the offense so long as "the defendant is the actual killer" of the victim]; accord, *Earp, supra,* 20 Cal.4th 936, 905.)[18] Because, as observed *ante*, footnote 17, international law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements, defendant's related international law claim also fails. (See *Taylor, supra,* at p. 661.)

C. *Absence of "intercase proportionality review"*

Defendant asserts that the federal Constitution requires "intercase proportionality" review — a comparison of the imposed sentence with sentences in other similar cases. He argues that failure to provide such review on appeal violates his "Eighth Amendment right to be protected from the arbitrary and capricious imposition of capital punishment and also violates his Fourteenth Amendment right to equal protection of the law."

The absence of a comparative proportionality review under California's death penalty law does not render the law or sentence unconstitutional. (See *Pulley v. Harris* (1984) 465 U.S. 37, 50-51; *People v. Verdugo* (2010) 50 Cal.4th 263, 305, and cases cited.) " 'Nor does the circumstance that intercase proportionality review is

_____

[18] By contrast, when the defendant is an aider and abettor rather than the actual killer, intent to kill, or at least reckless indifference to human life, must be proved. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1146-1147; § 190.2, subd. (c).)

conducted in noncapital cases cause the death penalty statute to violate defendant's right to equal protection and due process.' " (*Verdugo*, *supra*, at p. 305; see *People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

### D. *General challenges to the death penalty statute and instructions*

Defendant raises several unmeritorious challenges to California's death penalty statute, section 190 et seq., and the related standard CALJIC sentencing instructions.

Contrary to his assertions, "[t]he death penalty law is not unconstitutional for failing to impose a burden of proof — whether beyond a reasonable doubt or by a preponderance of the evidence — as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence. [Citation.] Unlike the statutory schemes in other states cited by defendant, in California ' "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' [Citations.]" (*Brown, supra,* 33 Cal.4th at p. 401.) Moreover, "[t]he jury is not constitutionally required to achieve unanimity as to aggravating circumstances." (*Id.,* at p. 402; see *People v. Cowan* (2010) 50 Cal.4th 401, 489, and cases cited.)

Defendant asserts the trial court erred by instructing pursuant to CALJIC No. 8.84 ("Penalty Trial — Introductory"), setting out the penalties of "death or imprisonment in the state prison for life without possibility of parole . . . ." He observes that during jury selection, one of the prospective jurors expressed concern that a person sentenced to life imprisonment could be paroled from prison. Thereafter, at the request of both parties, immediately prior to the exercise of peremptory challenges the trial court informed the jury that "life without possibility of parole means just that, life without possibility of parole." Defendant complains that a

similar instruction was not given prior to penalty phase deliberations, advising the jury that he "would never be considered for release on parole." Instead, prior to deliberations, the trial court simply instructed the jury pursuant to CALJIC No. 8.84, which, defendant asserts, inadequately informed the jury that a sentence of confinement in state prison for life without possibility of parole would render him ineligible for release from prison on parole. We repeatedly have rejected this claim and versions of it. (*People v. Ervine* (2009) 47 Cal.4th 745, 798; *People v. Prieto* (2003) 30 Cal.4th 226, 269-271.)

Defendant also faults the trial court for instructing pursuant to CALJIC No. 8.85 ("Penalty Trial — Factors for Consideration"), concerning the statutory mitigating and aggravating sentencing factors set out in section 190.3 to be considered in determining whether to impose a sentence of death or life without possibility of parole, and CALJIC No. 8.88 ("Penalty Trial — Concluding Instruction"), concerning the jury's obligations in reaching a penalty determination.

Regarding CALJIC No. 8.85, defendant reasserts claims rejected many times previously. We adhere to our prior decisions in rejecting defendant's argument that section 190.3, factor (a) — the "circumstances of the crime" factor — is unconstitutionally vague and ambiguous, and fails to adequately narrow the bases for imposing the death penalty, thus rendering the sentence arbitrary and capricious. (See *People v. Foster* (2010) 50 Cal.4th 1301,1363-1364; *People v. Kipp* (2001) 26 Cal.4th 1100, 1137; see also *Hughes*, *supra*, 27 Cal.4th at pp. 403-404.) Nor was the jury improperly instructed on the "force or violence" factor under section 190.3, factor (b). We have rejected claims that (1) the jury must be instructed to unanimously agree that the defendant committed each alleged act of violence before that act may be considered by the jury; (2) consideration of "unadjudicated" criminal acts by the defendant violated his due process or equal protection rights; (3) failure to require a

unanimous jury finding on the unadjudicated acts of violence denied the defendant his Sixth Amendment right to a jury trial; and (4) the Eighth Amendment requires a unanimity instruction concerning factor (b) evidence. (*Lewis*, *supra*, 43 Cal.4th at pp. 533-534; *Kipp, supra,* at p. 1138, and cases cited; *Brown, supra,* 33 Cal.4th at p. 402.)

Regarding the jury's penalty determination process, defendant asserts that some of the terms employed in CALJIC No. 8.88 — "so substantial" and "warrant[]" — together with the instruction's alleged failure to expressly inform the jurors that the central determination is whether death is the appropriate punishment, rendered the instruction vague and misleading. He further observes that the instruction failed to specify that if aggravating factors do not outweigh those in mitigation, a sentence of life in prison without possibility of parole is mandatory. Finally, he argues, the instruction failed to inform the jury that neither party bore the burden of persuasion. As the People observe, we have repeatedly considered and rejected these and related arguments. (See, e.g., *Lewis*, *supra*, 43 Cal.4th at p. 533 [the term "so substantial" is not unconstitutionally vague under the federal Constitution's Eighth Amendment]; *Coffman and Marlow, supra,* 34 Cal.4th at p. 124; *People v. Crew, supra,* 31 Cal.4th at p. 858.)

Finally, defendant reprises other oft-rejected claims: that the trial court was obligated to delete assertedly inapplicable statutory factors (see *People v. Bramit* (2009) 46 Cal.4th 1221, 1248); that the jury must be instructed which factors are aggravating and which are mitigating (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1151; *People v. Raley* (1992) 2 Cal.4th 870, 919); that use of adjectives such as "extreme" violated various constitutional rights (*People v. Yeoman* (2003) 31 Cal.4th 93, 165); and that written findings are required with regard to aggravating factors (*Lewis*, *supra*, 43 Cal.4th at p. 533; *People v. Davis* (1995) 10 Cal.4th 463, 549). He

50

asserts that these alleged defects, coupled with the absence of intercase proportionality review, amounts to an unconstitutional deprivation. We agree with the People: "One cannot add a group of negative numbers and obtain a positive sum."

E. *Asserted cumulative error and violation of international law*

For similar reasons we reject defendant's contention that "cumulative error" requires reversal — there being no error to cumulate. We also reject his repeated assertion that international law bars his sentence. (See *ante*, fn. 17.)

V. CONCLUSION

We affirm the judgment in its entirety.


CANTIL-SAKAUYE, C. J.


WE CONCUR:


KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Watkins

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S026634
**Date Filed:** December 17, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert M. Martinez

_____

**Counsel:**

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointments by the Supreme Court, and Nina Rivkind, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Louis W. Karlin, Keith H. Borjon and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nina Rivkind
Deputy State Public Defender
221 Main Street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Stephanie A. Miyoshi
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-8784