Filed 12/3/24  P. v. Flores CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B328180 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA111925) |
| v. | |
| BRYAN FLORES, | |
| Defendant and Appellant. | |

Appeal from judgment of the Superior Court of Los Angeles County, Michael Villalobos, Judge.  Affirmed.

Megan Denkers Baca, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

_____

On April 18, 2022, a man armed with a knife robbed two Carl's Jr. employees, Esteban D.[1] and Jessica Rios, as they counted the money from the cash register at the end of the night shift. Surveillance cameras captured the incident, but the identity of the suspect—who wore a surgical face mask, baseball cap, and long-sleeved shirt—was not apparent from the footage.

Four days later, Esteban was working another night shift at the Carl's Jr. when he saw a man he believed to be the robber loitering in the restaurant's parking lot. Esteban's coworker called the police, who apprehended the man a short distance from the restaurant. Officers recovered a knife from the man's pocket. Although the man falsely identified himself as "Richard Castillo," officers determined that he was, in fact, appellant Bryan Flores.

Police transported Esteban from the Carl's Jr. to the location where they had detained Flores, and Esteban identified Flores as the robber. The district attorney charged Flores with second degree robbery. (Pen. Code, § 211.)[2] At trial, Esteban conceded that he was "uncertain" in his identification of Flores as the perpetrator, and no other eyewitness testimony linked Flores to the crime. The jury nonetheless convicted Flores, and the trial court sentenced him to six years in prison.

Flores now asks us to reverse his conviction, advancing three categories of arguments. First, the trial court abused its discretion by (1) admitting evidence of Flores's knife, notwithstanding the dismissal at the preliminary hearing of a separate charge against Flores for carrying a concealed knife, and (2) permitting testimony

---

[1] Because Esteban D. was 17 years old at the time he testified, the record identifies him only by his first name and the first initial of his last name.

[2] All statutory references are to the Penal Code.

that Flores provided a false name to police at the time of his arrest. Second, defense counsel rendered ineffective assistance by (1) failing to move to exclude Esteban's identification as the product of an unduly suggestive "field show-up" procedure, (2) neglecting to consult with or present testimony from an expert on eyewitness identification, (3) electing not to present a case in chief, and (4) opening the door to testimony that Flores acquired a neck tattoo after the robbery, but prior to trial. Third, the cumulative effect of the errors mandates reversal of his conviction.

We conclude, however, that Flores is not entitled to relief. The trial court acted within its discretion in admitting the challenged evidence. And although we agree that the prosecution's case at trial was thin,[3] Flores fails to demonstrate any prejudice from defense counsel's purported errors. Finally, the absence here of any trial court error or prejudice is fatal to Flores's cumulative error argument.

Accordingly, we affirm.[4]

## FACTUAL SUMMARY AND PROCEDURAL HISTORY[5]

### A. The Robbery

A few minutes before midnight on April 18, 2022, Esteban and Rios were working the night shift at the Carl's Jr. in Monterey

_____

[3] On appeal, Flores does not challenge the sufficiency of the evidence supporting his conviction.

[4] Flores filed a separate petition for writ of habeas corpus on February 6, 2024 (case No. B334975), which we consider concurrently with this appeal. We address the petition in a separate order.

[5] We summarize here only the facts and procedural history relevant to our resolution of this appeal.

Park. The two had locked the doors to the restaurant and were in the process of counting the money in the cash register. A man—wearing a light-colored surgical mask, baseball cap, long-sleeved shirt, shorts, and long socks—knocked on one of the restaurant's glass doors. Esteban approached and spoke to the man through the glass door, at a distance of approximately two to three feet. The man asked to use the restroom, and Esteban let him into the restaurant. The man spent a few minutes in the restroom before exiting and walking around the dining room.

Ignoring requests that he leave the restaurant, the man approached the counter where Esteban and Rios continued to count the money from the cash register. The man pulled out a knife and demanded the money. When Esteban and Rios did not immediately comply, the man walked around the counter, pointed the knife at Esteban, and threatened to stab him. Esteban gave the man the money he and Rios had been counting. The man fled with approximately $500 in total, and Esteban called the police.

Officers responded to the restaurant shortly after the robbery and collected statements from Esteban and Rios. Esteban told police that he "th[ought he] could" identify the man if he saw him again, with the caveat that "the mask ma[de] it hard—and the hat." Rios told police that she did not believe she could identify the suspect, although she felt she could identify his knife.

### B.     Esteban's Identification of Flores

Four days later, on April 22, 2022, Esteban again was working the night shift at the Carl's Jr. He had been feeling "paranoid of [his] surroundings" since the robbery. Just before midnight, Esteban observed a man standing outside in the restaurant's parking lot, from a distance of approximately 40 feet. Esteban described the man as wearing a hat, "long hoodie," and

4

shorts, and as having approximately the same stature and skin tone as the robber. After the man "stared at [Esteban and his coworker] for about 30 seconds," the man walked past the restaurant, pulling a surgical mask up over the lower portion of his face as he did so.

Esteban told his coworker, "I think that's [the robber[,] I think] he's back." Esteban's coworker called the police, and Esteban observed the man cross the street. The man "turned back" and appeared to "ke[ep] staring back" at the Carl's Jr. before entering a nearby store.

Police responded and detained the man, whom they located an approximately two-minute driving distance from the Carl's Jr. The man, later identified as Flores, falsely identified himself to officers as "Richard Castillo," but otherwise complied with the officers' instructions. Flores stated that he was carrying a knife, which officers recovered from the right front pocket of his shorts.

Responding Officer Peter Cienfuegos drove Esteban to Flores's location and asked whether Esteban could identify Flores as the man who committed the robbery. Before doing so, Officer Cienfuegos provided Esteban with the following admonition:

" '[Y]ou are under no obligation to identify this person as a suspect. We want you to have guilty person [*sic*] identified. But we also want you to make sure that the innocent people are cleared of any suspicion in this matter. You should not draw any conclusions about a person just because he or she is in our custody or handcuffed.' "

Several police cars surrounded Flores and two officers were holding him to the floor when Esteban arrived on the scene to make the identification. Esteban, who remained seated in the officer's car at a distance of between 17 and 40 feet from Flores, stated, "I think it's him." Police then arrested Flores for the robbery.

5

## C.     The Preliminary Hearing and Information

At Flores's preliminary hearing, the prosecution presented testimony from Rios and a police officer who had spoken with Officer Cienfuegos, but who had not himself participated in Flores's arrest, in support of charges of second degree robbery (§ 211) and carrying a concealed dirk or dagger (§ 21310).  The officer, however, could not testify concerning the knife recovered from Flores because he "did not question [Officer Cienfuegos] about the knife."

Accordingly, although the court held Flores to answer on the robbery charge, it dismissed the section 21310 count based on the prosecution's failure to present "any evidence . . . that the knife was carried in a concealed manner."

The district attorney subsequently filed a one-count information charging Flores with second degree robbery.

## D.     The Trial

At the October 2022 jury trial, the prosecution presented three witnesses:  Esteban, Rios, and Officer Cienfuegos.  The prosecution also introduced surveillance video footage of the robbery, photographs of the Carl's Jr. restaurant and surrounding area, a photograph of the knife recovered from Flores, the physical knife itself, and still images of Flores created from officer body camera footage captured the night of his arrest.

Defense counsel did not present a case in chief, although she did introduce officer body camera footage documenting a portion of Esteban's statement to police the night of the robbery.  And as set forth, *post*, defense counsel subjected each of the prosecution's witnesses to cross-examination.

### 1. *Eyewitness Identification Testimony and Surveillance Video Footage*

Esteban provided the only eyewitness testimony identifying Flores as the robber.[6]  Although Officer Cienfuegos testified that Esteban had "confidently" and with only "slight hesitance" identified Flores at the field show-up, Esteban himself testified that he lacked confidence in both his pretrial and in-court identifications.

After defense counsel played an excerpt of his recorded statement to police the night of the robbery, Esteban conceded that he had felt unsure of his ability to identify the perpetrator even immediately following the crime:

"[Defense counsel]:  So when the officer asked you, Mr. Esteban, if you could identify the person that committed the robbery, again you seemed a little unsure.  Would you agree?

"[Esteban]:  Yes.

"[Defense counsel]:  Yeah, you were unsure on, you know, this interview and this was . . . [¶] . . . [¶] . . . within the hour of the . . . [¶] . . . [¶] . . . robbery, right.  And you did feel a little unsure about whether or not you could identify the person again?

"[Esteban]:  Yes."

Esteban testified that he felt similarly uncertain of his in-the-field and courtroom identifications of Flores:

"[Prosecutor]:  . . . [A]s you sit here today, are you confident in your identification of [Flores during the] April 22nd [field show-up]?

"[Esteban]:  No."

---

[6] Rios testified that she told officers after the robbery that she did not feel she could identify the suspect, and she was unable to make an in-court identification of Flores as the perpetrator.

"[Prosecutor]: Now, I also want to ask you this, when I ask[ed] you to take a look around the courtroom, yesterday you did that and you pointed somebody out for us. You pointed out the defendant. Do you remember that?

"[Esteban]: Yes.

"[Prosecutor]: How was it you were able to identify the defendant in court yesterday?

"[Esteban]: You just—it's like body type and everything like I still feel like uncomfortable still just being like—

"[Prosecutor]: We want you to be honest. So can you please explain for us how you feel about your identification today?

"[Esteban]: I would say still uncertain like I said, but there's no way to be 100 percent sure because I couldn't see his face if he had tattoos or anything because he did a good job covering up. But from what I—from what I remember like his body type, his height, his skin tone, I go off by that just how that's how I go off by."

In addition to Esteban's eyewitness testimony, the prosecution introduced surveillance video footage of the robbery. The robber's face is not clearly visible in the video, but his build and clothing generally match Esteban's description: the video captures a slender man wearing a surgical face mask, a dark baseball cap with a white logo, long sleeves, shorts, and long socks committing the robbery. In the video, however, the robber's surgical mask appears to be white, rather than black, as Esteban testified. The robber's knife is not clearly visible in the footage.

8

## 2. *Testimony Concerning the Potential Unreliability of Eyewitness Identifications*

Defense counsel did not present any expert witness testimony at trial, but did elicit testimony during her cross-examination of Officer Cienfuegos concerning (1) the potential unreliability of eyewitness identifications, and (2) the distinction between a field show-up identification and a line-up identification procedure:

"[Defense counsel]: . . . [A]s part of [your] training, I imagine, you learn about the inherently faulty nature of eyewitness identification?

"[Officer Cienfuegos]: Yes, ma'am.

"[Defense counsel]: You did learn that okay, okay. And you learned that it was important—well, that memory can be [faulty]?

"[Officer Cienfuegos]: Yes, ma'am."

"[Defense counsel]: . . . [I]n this case you guys didn't do a line-up, right?

"[Officer Cienfuegos]: No, ma'am.

"[Defense counsel]: Could you describe to the jury what a line-up is?

"[Officer Cienfuegos]: A line-up is where there's different individuals that are presently resembling a subject or a person of interest that they put in a room in which we bring a witness, a victim inside and ask if they can identify the person along with other members who have been randomly selected.

"[¶] . . . [¶]

"[Defense counsel]: . . . [A]nd the purpose of this is to have the witness identify who their assailant was among these individuals that are similar looking. Would you agree?

"[Officer Cienfuegos]: Yes.

"[Defense counsel]: And that's not something that was done in this case?

9

"[Officer Cienfuegos]: No, ma'am.

"[Defense counsel]: So what actually happened in this case is that it was a show-up meaning that it was just Mr. Flores that was the only individual from which Mr. Esteban could choose whether or not that was the correct person, right?

"[Officer Cienfuegos]: Yes, ma'am."

### 3. *Evidence Concerning the Robber's Knife and the Knife Recovered from Flores*

Both Esteban and Rios testified concerning the appearance of the knife used in the robbery. Esteban described the knife as approximately six inches long, matte gray and "thin," "kind of like a dagger." Esteban conceded on cross-examination, however, that he "didn't spend a lot of time looking at the knife" during the incident.

Rios, in contrast, testified that she had focused her attention during the robbery "[m]ostly . . . on the money and on the knife." She described the robber's knife as silver or gray and "kind of pointy," with a blade approximately five inches long. She could not remember whether the knife was shiny or matte. And neither Esteban nor Rios could recall whether the knife bore any pattern or design.

Over defense objection, the trial court admitted a photograph of the knife recovered from Flores and the physical knife itself. A ruler in the photograph indicates the blade of the knife is approximately four inches long, and, as Officer Cienfuegos testified, the knife is "mostly black," with some gray, and is decorated with "distinctive markings" that appear to be "images of marijuana plants." Esteban and Rios, to whom the prosecution presented only the photograph of the knife at trial, testified that the knife recovered from Flores appears "similar" to the knife used in the robbery.

#### 4. *Flores's False Statement to Police*

Defense counsel moved to exclude from trial the fact that Flores provided officers with a false name at the time of his arrest. She argued that Flores's false statement does not demonstrate any consciousness of guilt because (1) the victims of the robbery did not know Flores's name, and (2) at the time of his arrest, Flores had an outstanding bench warrant for an unrelated section 273.5[7] charge and provided a false name merely to avoid identification in connection with that warrant.

The trial court found the statement relevant and admissible. But the court also prohibited the prosecution from referencing the statement or arguing that it demonstrates consciousness of guilt because the defense would be unable to rebut such an argument without introducing unduly prejudicial evidence of Flores's outstanding bench warrant.

The only reference to Flores's false statement at trial consisted of the following exchange during Officer Cienfuegos's direct examination:

"[Prosecutor]: . . . [W]hen you contacted [the] defendant in this case[,] what name did he give you?

"[Officer Cienfuegos]: Richard Castillo."

#### 5. *Flores's Neck Tattoo*

During cross-examination, defense counsel questioned Esteban concerning the absence of any visible tattoos or markings on the robber's neck:

"[Defense counsel]: . . . [W]ere you able to see his neck area?

---

[7] Section 273.5 imposes certain penalties on "[a]ny person who willfully inflicts corporal injury resulting in a traumatic condition upon [specified] victim[s]." (§ 273.5, subd. (a).)

"[Esteban]: Yes.

"[Defense counsel]: Okay, and you didn't describe any tattoos around the neck area?

"[Esteban]: I couldn't see tattoos. I didn't see tattoos.

"[Defense counsel]: Oh, okay. Any other kind of marking around the neck[,] whether it would be beauty marks or moles or scars, you didn't describe any of that to the police, right?

"[Esteban]: No, I didn't."

At a subsequent break in the proceedings, outside the presence of the jury, the prosecutor flagged for the court that Flores appeared to have acquired a neck tattoo while in custody awaiting trial. She presented two images of Flores's head and neck taken from police body camera footage demonstrating that Flores had no neck tattoo at the time of his arrest, and she requested that the court permit her to elicit testimony from Officer Cienfuegos establishing that fact:

"[Prosecutor]: . . . I wanted to show these photos to the officer to demonstrate at the date of [Flores's] arrest, he didn't have any [neck tattoos] because the defense had asked a question about whether Esteban had noticed if the defendant had any neck tattoos or . . . other visible tattoos."

After comparing the photographs with Flores's in-court appearance, the court ruled the prosecution could introduce the photographs and question Officer Cienfuegos concerning the absence of any tattoo on Flores's neck at the time of his arrest:

"[The court]: I would allow the testimony because [Esteban] did testify that he didn't see any noticeable tattoos. So I think the fact that he, in these pictures, you don't see any noticeable tattoos that kind of goes to what he was saying. . . .

"[¶] . . . [¶]

12

" . . . For the record[, Flores has] got a very dark tattoo writing on the right side of his neck and . . . it would be in this picture [taken from the body camera footage the night of the arrest]."[8]

The prosecutor thereafter presented to Officer Cienfuegos the two photographs showing the absence of any neck tattoos on Flores the night of his arrest, and Officer Cienfuegos testified that the photographs accurately reflect Flores's appearance that night.

### E.    Motion for Judgment of Acquittal

At the close of evidence, defense counsel moved for a judgment of acquittal pursuant to section 1118.1,[9] arguing that the prosecution had failed to present sufficient evidence of Flores's guilt in light of Esteban's uncertain identification.  The trial court denied the motion, explaining:

"I think there's more than enough evidence for it to go to the jury.  I think the identification was fairly good.  I mean, and we did have testimony that when [Esteban] did the field show-up I.D., he did have a degree of more certainty at that time.  And so I think that, and with the corroborating circumstantial evidence having the knife[,] being in front of the store four days later after the robbery,

---

[8] No photograph of Flores's neck tattoo appears in our record on appeal.

[9] Section 1118.1 provides, in relevant part:  "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."  (§ 1118.1.)

I think all that corroborates and he does fit the general description that was given. And I was looking at the socks, those socks look very similar to me. Those socks in what I saw on the [surveillance video] and when the socks [*sic*] when he was arrested, I don't know, I thought it's the same socks."

### F.     Closing Argument

During closing argument, the prosecutor urged the jury to convict Flores based on the surveillance video, Esteban's identification, and the "corroborative evidence" that Flores possessed a knife similar to the one used in the robbery. Although she conceded that Esteban testified he was "uncertain" about his identification, the prosecutor argued that "[Esteban is] not the one who needs to be certain, members of the jury, you do." She also argued that the absence of any neck tattoo on Flores at the time of his arrest is "important evidence" because it is "yet another piece of physical evidence that helps [to] corroborate Esteban's testimony." The prosecutor did not reference Flores's false statement to police, nor did she make any argument concerning consciousness of guilt.

### G.     Jury Deliberations, Verdict, and Sentence

During deliberations, the jury asked to examine the knife and to review the surveillance video footage. The jury also requested a readback of all testimony concerning the knife and the robber's clothes, and posed the following question: "We want to know if the hat was fitted or had a snap on the back." The court responded, "We cannot answer your question. You must rely on the evidence presented in court."

After deliberating for nearly six hours over the course of two days, the jury convicted Flores of second degree robbery.

Flores timely appealed.

14

## DISCUSSION

Flores mounts three categories of challenges to his conviction, arguing (1) the trial court abused its discretion in admitting evidence that he possessed a knife and provided a false statement to police at the time of his arrest, (2) his trial counsel rendered ineffective assistance, and (3) the cumulative effect of the court's and counsel's errors compels reversal of his conviction. We consider, and reject, each contention in turn.

### A. The Trial Court Acted Within Its Discretion in Admitting the Challenged Evidence

#### 1. *The Knife Recovered from Flores*

At the preliminary hearing, the court dismissed the count charging Flores with carrying a concealed dirk or dagger. (§ 21310.) On appeal, Flores contends that this dismissal indicates the court determined the knife found in his possession was not used in the robbery, and the court therefore abused its discretion and violated his due process rights by permitting the prosecution to introduce evidence of his knife at trial. In support of his argument, he points to cases holding that evidence of weapons other than the crime weapon is inadmissible. (See, e.g., *People v. Abel* (2012) 53 Cal.4th 891, 928 ["[e]vidence a defendant possessed weapons that were not used to commit a crime is inadmissible to show the defendant committed the crime].) Flores's argument fails.

As an initial matter, the court did not make any determination at the preliminary hearing concerning whether Flores's knife was used in the commission of the robbery. The court dismissed the section 21310 charge based solely on its determination that the prosecution had failed to present any evidence that Flores had carried the knife "in a concealed manner."

15

Moreover, the prosecution introduced testimony from both Esteban and Rios supporting that Flores's knife might have been the crime weapon. Flores's possession of the knife therefore constitutes relevant circumstantial evidence that he committed the robbery, and the trial court did not abuse its discretion or run afoul of due process in admitting evidence of the knife. (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 ["Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. . . . [citation] . . . . The evidence was thus relevant and admissible as circumstantial evidence that [the defendant] committed the charged offenses"]; *People v. Waidla* (2000) 22 Cal.4th 690, 717 (*Waidla*) [an appellate court "examines for abuse of discretion a decision on admissibility that turns on the relevance of the evidence in question"]; *People v. Falsetta* (1999) 21 Cal.4th 903, 913 ["[t]he admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair"].)

## 2. *Flores's False Statement to Police*

We likewise are unpersuaded by Flores's contention that the trial court abused its discretion in admitting evidence that he provided police officers with a false name at the time of his arrest. Flores contends that, because the court prohibited the prosecution from arguing that his false statement reflects consciousness of guilt, the evidence has no relevance. He contends further that the statement is irrelevant because "the prosecution's theory of the case did not envision the robber's need to conceal his name from the police, given that the victims did not know the robber's name." In support of these contentions, Flores cites to *People v. Fritz* (2007) 153 Cal.App.4th 949 (*Fritz*), where the trial court abused its

16

discretion in admitting evidence of a defendant's false statement to police.

Here, however, the trial court properly concluded that "[t]he use of an alias" may be relevant as "circumstantial evidence of consciousness of guilt." (*People v. Manson* (1976) 61 Cal.App.3d 102, 149 (*Manson*); see *People v. Watkins* (2012) 55 Cal.4th 999, 1028.) Although the police and victims did not know Flores's name prior to his arrest, nothing in the record indicates that Flores was aware of that fact. As the Attorney General argues, Flores "could have suspected that he was being stopped as a suspect in the robbery four days prior, and . . . did not want the police to have his real name for the investigation." And the limitations the trial court placed on the prosecution's use of the false statement do not render the statement irrelevant; rather, those limitations reflect the trial court's effort to avoid unfair prejudice resulting from the admission of relevant evidence.

Finally, the *Fritz* case on which Flores relies is distinguishable. In *Fritz*, the defendant stipulated to the fact that he had two prior convictions for shoplifting, and the "parties agreed that the court would not read the allegations concerning [those] priors to the jury." (*Fritz*, *supra*, 153 Cal.App.4th at p. 954.) The prosecution nonetheless sought to introduce evidence of the prior convictions to impeach the defendant's post-arrest statement that he had never before engaged in shoplifting. (*Ibid.*) The trial court permitted the prosecution to introduce both the defendant's post-arrest statement and evidence of his prior convictions as evidence of his consciousness of guilt. (*Id.* at p. 955.)

The Court of Appeal reversed, explaining that the defendant's false statement denying he had ever shoplifted "was apparently intended to mislead the police as to an issue which was . . . 'in no way relevant to the issues'; i.e., his *disposition* to commit

17

the crime." (*Fritz, supra*, 153 Cal.App.4th at p. 958.) The court reasoned further that the evidence "was particularly prejudicial . . . because it . . . revealed the forbidden 'disposition' evidence [of the prior shoplifting convictions]—something the jury was otherwise prohibited from hearing." (*Id.* at p. 959.)

But Flores did not attempt to mislead police about his *disposition* to commit robbery by, for example, denying that he had ever committed robbery in the past. Instead, Flores provided the police with an alias—a fact that constitutes circumstantial evidence of his consciousness of his guilt and an attempt to mislead police as to his involvement in the robbery. (See *Manson, supra*, 61 Cal.App.3d at p. 149.)

We therefore conclude the trial court acted within its discretion in admitting evidence of Flores's false statement to police. (See *Waidla, supra*, 22 Cal.4th at p. 717.)

### B. Flores Fails To Demonstrate Prejudice from His Counsel's Alleged Errors

Flores contends his trial counsel rendered ineffective assistance by (1) failing to file a pretrial motion in limine to exclude Esteban's identification of him, (2) neglecting to consult with or present testimony from an expert on eyewitness identification, (3) electing not to present a defense case in chief, and (4) opening the door to testimony that Flores had acquired a neck tattoo while in custody awaiting trial.

Even assuming, however, that trial counsel's actions constitute error, Flores has failed to demonstrate the requisite prejudice. "In considering a claim of ineffective assistance of counsel, it is not necessary to determine ' "whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack

18

of sufficient prejudice, which we expect will often be so, that course should be followed." ' [Citations.] It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

Flores fails to demonstrate any prejudice from defense counsel's decision not to file a motion in limine seeking to exclude evidence of Esteban's eyewitness identification. Flores contends defense counsel should have argued that Esteban identified Flores only as the result of an unconstitutional, unduly suggestive field show-up procedure. But this argument ignores the facts here: Esteban saw Flores in the parking lot of the Carl's Jr. four days after the robbery, and his coworker called the police because Esteban believed Flores to be the robber. Esteban thus independently identified Flores as the suspect before officers arrived on the scene, and the identification therefore did not result from any allegedly suggestive aspects of the field show-up conducted by police. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 413, as modified Jan. 27, 1999 ["for a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness—i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure"].)

Flores likewise fails to establish prejudice resulting from his counsel's purported failure to consult with or present trial testimony from an expert concerning the unreliability of eyewitness identifications in stressful situations. Nothing in the record— such as a declaration from counsel—establishes that Flores's trial attorney failed to consult with an eyewitness identification expert. Flores urges us to assume this is the case because no motion for

19

appointment of an expert appears in the record; however, Flores tacitly concedes that this at most "suggests" that defense counsel failed to consult with an expert.

Moreover, Esteban (1) observed Flores in both a lower stress context (Flores's request to use the restroom) and higher stress context (the robbery), and (2) was quite candid about his lack of confidence in his own identification of Flores as the perpetrator. In addition, Officer Cienfuegos admitted on cross-examination that his police training included "learn[ing] about the inherently faulty nature of eyewitness identification." We therefore are not convinced it is reasonably probable that testimony from an eyewitness identification expert would have resulted in a more favorable outcome for Flores. (See also *People v. Datt* (2010) 185 Cal.App.4th 942, 952 [finding "no support for the claim that expert testimony must be presented by a defense attorney in every case where an eyewitness identification is uncorroborated," italics omitted].)

Nor are we persuaded that Flores suffered prejudice because his attorney "opened the door to testimony regarding [his] neck tattoo." We agree it is possible the jury might have "concluded that [Flores] obtained the tattoo in an attempt to conceal his true identity," but defense counsel's conduct did little, if anything, to heighten this possibility. At the time of trial, Flores's neck tattoo was "very dark" and "noticeable," and thus likely apparent to the jurors throughout trial. (See, e.g., *People v. Alexander* (2010) 49 Cal.4th 846, 903 (*Alexander*) ["the jury was able to evaluate the reliability of [an eyewitness identification] by comparing the photographs to the . . . defendant's current appearance at trial"].) And the prosecutor did not argue that Flores had deliberately altered his appearance to avoid conviction or that the tattoo reflected his consciousness of guilt. She argued only that the

tattoo constitutes "important evidence" because it "helps [to] corroborate Esteban's testimony." We thus cannot conclude that defense counsel's tattoo-related line of questioning resulted in prejudice.

Finally, we are unpersuaded that defense counsel's purportedly deficient performance amounted to abandonment of counsel in violation of Flores's rights under the Sixth and Fourteenth Amendments. (See *United States v. Cronic* (1984) 466 U.S. 648, 656–657.) Flores faults his attorney for "fail[ing] to put on a single witness or raise any affirmative defense." (Italics omitted.) But apart from an eyewitness identification expert, Flores identifies no witnesses or legal defenses his counsel purportedly should have presented at trial. And as discussed, *ante*, we disagree that defense counsel prejudicially erred in electing not to present expert testimony.

Accordingly, we conclude that Flores has failed to demonstrate that any error by his trial counsel compels reversal of his conviction.

## C. Flores's Cumulative Error Argument Fails

As set forth, *ante*, we conclude the trial court acted within its discretion in admitting evidence of Flores's knife and false statement, and we are not persuaded that defense counsel's performance resulted in prejudice. We therefore reject Flores's argument that the cumulative effect of the purported errors here mandates reversal of his conviction. (See *Alexander*, *supra*, 49 Cal.4th at p. 939 ["[I]n those circumstances in which we have assumed error, we have concluded [the] defendant could not have been prejudiced. We are not persuaded that, even if considered cumulatively, such errors could have denied defendant a fair trial"].)

21

## DISPOSITION

The January 12, 2023 judgment is affirmed.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

WEINGART, J.