Filed 12/10/24  P. v. Ramage CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSHUA LARUE RAMAGE,<br><br>    Defendant and Appellant. | F086997<br><br>(Super. Ct. No. BF185802A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Cynthia Lee Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Jessica Trieu-Simerly, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant and appellant Joshua LaRue Ramage was convicted of driving under the influence and committing an illegal act or failing to perform a legal duty that caused

physical harm (Veh. Code, § 23153, subd. (a)),[1] driving with a blood alcohol content of 0.08 percent or more and committing an illegal act or failing to perform a legal duty that caused injury (§ 23153, subd. (b)), and hit and run causing death or serious bodily injury (§ 20001, subd. (b)(2)).  The jury found true the allegations that Ramage personally inflicted great bodily injury upon A.B. in violation of Penal Code section 12022.7, subd. (a), personally inflicted great bodily injury, coma or paralysis to A.B. within the meaning of Penal Code section 12022.7, subd. (b), and proximately caused bodily injury to more than one victim within the meaning of Penal Code section 23558.

On appeal, Ramage claims there was insufficient evidence that he committed an illegal act or neglected a legal duty which caused the injury to sustain the convictions for driving under the influence and driving with a blood alcohol content of 0.08 percent or higher causing injury.  We conclude substantial evidence supports Ramage's convictions and affirm the judgment.

## PROCEDURAL BACKGROUND

On May 17, 2022, the Kern County District Attorney charged Ramage with driving while under the influence of alcohol and committing an illegal act or failing to perform a legal duty that caused injury (§ 23153, subd. (a); count 1); driving with a blood alcohol level of 0.08 percent or more and committing an illegal act or failing to perform a legal duty that caused injury (§ 23153, subd. (b); count 2), and hit and run causing death or permanent serious injury (§ 20001, subd. (b)(2); count 3.)  As to the first two counts, it was alleged that Ramage personally inflicted great bodily injury to A.B. (Pen. Code, § 12022.7, subd. (a)), personally inflicted coma or paralysis to A.B. (Pen. Code, § 12022.7, subd. (b)), caused bodily injury to more than one victim (§ 23558), and had a blood alcohol level above 0.15 percent (§ 23578).  Several aggravating factors for sentencing were also alleged.  (Cal. Rules of Court, rule 4.421(a)(1), (3).)

---

[1] All statutory references are to the Vehicle Code unless stated otherwise.

On May 31, 2023, a jury found Ramage guilty on all counts charged and found each of the allegations to be true.

On October 12, 2023, the trial court denied probation and sentenced Ramage to an aggregate term of six years four months in state prison. The term consisted of the low term of 16 months on Count 1, plus an additional five years for the personal infliction of coma or paralysis enhancement. The court imposed and stayed the three years for the personal infliction of great bodily injury enhancement and the one year for the multiple victims enhancement. As to Count 2, the court sentenced Ramage to the upper term and imposed sentences for the enhancements but stayed these sentences pursuant to Penal Code section 654. As to Count 3, the court sentenced Ramage to the upper term but stayed the sentence pursuant to Penal Code section 654.

**FACTUAL BACKGROUND**

**Prosecution case**

On May 1, 2021,[2] around 9:00 p.m., after getting food, D.A. (a male) and A.B. (a female) got on their bicycles and began riding back to A.B.'s mother's house. They rode down Stockdale Highway in the bike lane, with D.A. riding in front of A.B. D.A. said that both of their bicycles had reflectors and lights, and A.B.'s bike had a forward facing battery-operated light.

At around 9:14 p.m. on May 1, S.D. was driving her car on Stockdale Village and leaving the Vons shopping center with her daughter when she saw two bicyclists pass her. She waited at the corner for the bicyclists to turn right and get into the bicycle lane before she turned right to go westbound on Stockdale Highway. The male bicyclist was riding in front of the female bicyclist. Once on Stockdale Highway, both bicyclists were riding in the bike lane. Although neither bicyclist was wearing a helmet or reflective

---

[2] References to dates are to dates in 2021 unless stated otherwise.

clothing, the lighting in the area was adequate, there were no obstructions in the road, and S.D. could see them.

As S.D. was driving in the far right lane on Stockdale Highway, a large SUV came up next to her in the middle lane at approximately 55 or 60 miles per hour and then moved into her lane and cut her off. She had to slam on her brakes. The SUV continued into the bicycle lane without braking and struck both bicyclists. S.D. stated, "Unfortunately, I did see it all" and affirmed that D.A. and A.B. were both in the bicycle lane at the time of the collision. The SUV struck A.B. first, and the impact "put her up in the air and then she fell down onto her head." Then "the brunt of that continued onto the first bicyclist." The SUV continued driving past the right-turn lane into the Vons parking lot and went westbound on the frontage road. She observed that the bicyclists were struck "near the beginning of the paint where it says 'bike.' " The lighting was adequate in that area, enough for her to observe the bicyclists prior to and during the incident and observe the collision. On cross-examination, S.D. stated that when she hit the brakes after being cut off by the SUV, she heard the collision first, then looked up and saw the female coming down.

S.D. immediately told her daughter to call 911 while she checked on the victims. When S.D. checked on A.B., she noticed A.B.'s eyes were open and tracking but not blinking; A.B.'s breathing was shallow, and she did not move or speak. S.D. stayed at the scene of the collision for about 30 to 45 minutes, but she never saw the SUV return to the scene.

At around the same time, B.T. was riding in the front passenger seat as her daughter drove westbound by the Vons shopping center. They were in the far right lane when a truck about 10 to 12 feet in front of them suddenly veered to the right, hit two bicyclists who were riding in the bicycle lane, and threw them off their bicycles. The truck did not brake at all; it just swerved to the right and collided with the bicyclists.

B.T. said that the weather was clear and there were no obstructions on the road that would cause the truck to veer to the right.

After the collision, the truck did not stop and instead quickly fled the scene. B.T.'s daughter followed the truck as B.T. tried to get the license plate number. It turned onto Rio Bravo Drive and sped through the streets. B.T. was unable to get the license plate number because each time they got close, the truck sped up and maintained its distance. After they pursued the truck for "a good four minutes," the driver turned off the truck's headlights and continued to drive. B.T. and her daughter lost track of it in the dark.

B.T. and her daughter returned to the scene of the collision to check on the bicyclists. They remained at the scene for about 10 minutes, but B.T. did not see the truck return. Her daughter gave a statement to the police. B.T. stood next to her daughter and initially interjected by saying yes or nodding her head in agreement. At some point, she realized the officers were asking her daughter the questions, and not her, and so she stepped back and onto the sidewalk. In reviewing the body camera footage in court, B.T. was questioned about her nodding her head and she said she was agreeing with her daughter's statement "we saw the cyclists get hit." After saying she saw the bicyclist get hit, B.T.'s daughter said "I was kind of far back." B.T. acknowledged that she appeared in the video to nod her head in agreement but B.T. was not being asked the questions by law enforcement; her daughter was. When the video was played, the court noted for the record "[t]here's nothing in this video that indicates that [B.T.'s] agreeing with it. She's standing there. She's not nodding her head. She's not gesturing. She's looking away for a little bit."

B.T. did not give a statement to law enforcement officers because they were interested in her daughter and did not interview her. She said that "had I been questioned, I would have given the same information I'm giving you." B.T. said she was very clear on what she saw and very clear on what she testified.

Bakersfield Police Officer Jeremy Wolter received a report of a collision that occurred at Stockdale Highway and California Avenue at approximately 9:15 p.m. In response to the report, Wolter drove eastbound on Stockdale Highway until he observed a Ford Excursion stopped at a red light and in the left turn lane. After the driver of the Excursion made eye contact with the officer, he suddenly made a right turn instead of a left turn.

Officer Wolter noticed that the front headlight on the passenger side of the Excursion was caved in, which caused him to believe it might have recently been in a collision. When the officer observed the Excursion make a right turn from the left turn lane, he turned and followed the Excursion. The officer realized they were traveling away from the location of the collision. He initiated an investigative stop of the Excursion. When it stopped, the officer identified Ramage as the driver and the only person in the car.

When the vehicle pulled over, Ramage opened the driver's door and turned his body out of the vehicle. He said, "I hit those people" and "I gotta get back to the people." Officer Wolter noticed Ramage appeared to be intoxicated. He had red, watery eyes, slurred speech, smelled of alcohol and was unsteady on his feet. Ramage's performance on the field sobriety tests indicated he was impaired and under the influence of alcohol. He consented to a preliminary alcohol screening test and the result of the test showed his blood alcohol content was 0.255 percent. In the officer's opinion, Ramage was under the influence of alcohol and too impaired to safely operate a motor vehicle.

Officer Wolter noted the damage to Ramage's vehicle. The passenger side headlight was pushed in toward the engine compartment and there was damage to the side fender as well. The hood was dented down and had scratches and scuff marks.

Officer Zachary Burdick of the Bakersfield Police Department also responded to the radio call regarding a hit and run collision involving two persons. He arrived at the location to find medical personnel attending to two people lying in the road, near the

6.

sidewalk. The woman was lying on concrete in the right turn lane, which was to the right of the bike lane. She was unresponsive and not moving. The man was lying in the road, in the right turn lane. He had blood on his face, lacerations to the back of his head and blood coming from his nose. There was debris in the road leading up to their location. Photographs depicted a shoe in the bike lane, A.B.'s bicycle lying across both the bike lane and the right turn lane, another shoe in the right turn lane, and D.A.'s bicycle in the gutter and on the sidewalk. Burdick did not personally observe the bicycles in their original positions, but they were photographed before being moved. The area was well lit by light poles in the parking lot and lighting along the side of the road.

Officer Burdick testified that markings on the road, such as gouge marks or scrape marks in the roadway surface, help determine where a collision occurred. Burdick observed fresh gouge marks on the road within the bike lane, consistent with collision forces from a vehicle driving down on a bicycle into the roadway. The location of the debris is also significant because the debris field indicates a direction of travel. In this case, Burdick stated that when comparing the damage on the front passenger side of the vehicle with the debris field, it is "consistent with the trajectory of this debris field being forward and to the right of a westbound moving vehicle."

In Officer Burdick's opinion, the right front corner of the vehicle was in the bicycle lane where both bikes were traveling when the collision occurred. The evidence showed A.B.'s bicycle's rear wheel was located in the debris field in the bike lane, folded in half, from which Burdick deduced there was a rear impact to her bicycle. A.B.'s bicycle was lying on the line of the bike lane and the turn lane. D.A.'s bicycle was located on the sidewalk. Officer Burdick testified that, in his opinion based on his training, experience and the investigation of this accident, Ramage was at fault for this collision because he made an unsafe turning movement in violation of section 22107.

Officer Burdick did not recall any lighting equipment for the bicycles, nor did he see any reflective vests or helmets. Burdick did not know how fast the vehicle was going

7.

but in his opinion, the impact pushed the first bicycle forward and to the right, versus being run over by the vehicle or going under the vehicle. He also formed the opinion that the second bicycle had the same trajectory. Burdick testified that it was possible the rear tire of the first bicycle went under the vehicle since it was folded, and that it was less likely the rider went under the vehicle since the rider's elevation was at the same level and would cause a direct energy transfer, pushing the rider to the right. Burdick opined that the area of impact was at the entrance of the bike lane.

Both bicyclists were admitted to Kern Medical Center. D.A. sustained left rib fractures, a laceration to the spleen, lumbar vertebra fractures, and a scalp laceration. A hospital toxicology report showed D.A.'s urine sample tested positive for amphetamine, opiates, and phencyclidine. A.B. was diagnosed with acute respiratory failure, right and left rib fractures, a collapsed left lung, bleeding in the brain, a broken pelvis, a torn abdomen muscle, and a torn aorta. The bleeding in A.B.'s brain was considered a closed traumatic brain injury, and she had a skull fracture. She was intubated and sedated. The trauma surgeon who performed surgery on A.B. noted that she was not responsive during the one to two weeks he observed and treated her. She was in a coma and unable to speak or move her body in response to commands.

**Defense case**

Ramage testified that he was involved in a traffic collision at about 9:14 p.m. on May 1. Ramage had his first drink that day around 10:00 a.m. or 10:30 a.m., and drank a whole can of beer. He had another beer with lunch around 1:00 p.m. He left his house that day around 6:30 p.m. or 7:00 p.m. and drove to meet a friend at a restaurant. He had already consumed about seven or eight beers but said he did not feel the effects of alcohol. Ramage had two more beers at the restaurant. After about an hour, he got in his truck and left. He stated he did not recall how he felt at that time.

Ramage turned onto Stockdale Highway, in the third lane closest to the sidewalk. He was going to merge into the center lane but was waiting until he passed through a

green traffic light first. Before he merged into the center lane, he heard two loud distinctive booms. Ramage said he was looking forward with his hands on the steering wheel. He did not see the bicyclists beforehand because there were no lights. Ramage said he knew he hit something, that "it jerked my vehicle to the right" and he "saw a bike tire fly by the passenger window." He said he knew he hit multiple bicyclists by the two distinct thuds.

Ramage said he was not able to stop immediately or make a safe turn due to the size of his vehicle, and so he proceeded to drive on Stockdale Highway. He testified that he knew he had to get back to the victims and that he knew a way back to the victims by driving through the neighborhood. He did not notice any cars following him through the neighborhood. Ramage drove into a left turn lane intending to return to the scene of the accident when he saw Officer Wolter. He made eye contact with Wolter and then he "just knew" Wolter was going to pull him over. Wolter initiated his lights when the left light turned green, so Ramage said he turned right instead.

Ramage pulled over and told Officer Wolter he needed to get back to the accident scene. He also told Wolter he knew he was going to jail. Ramage knew he had been drinking throughout the day and was not confident he could pass the field sobriety tests. He said he felt a buzz and admitted he felt the effects of alcohol, but did not believe he was impaired. Ramage believed that his blood alcohol content would be high and guessed it was .21 percent. He acknowledged the legal limit is 0.08 percent and that he was "not supposed to be operating a vehicle with that level of alcohol in your system."

**Verdict**

On May 31, 2023, after three days of evidence and approximately two hours of deliberation, the jury found Ramage guilty on all counts charged and found each of the allegations to be true.

## DISCUSSION

**Substantial Evidence Supports Ramage's Convictions in Counts 1 and 2**

Ramage contends the evidence was insufficient to sustain his convictions in Counts 1 and 2 and that his convictions must be reversed. Specifically, he claims the evidence fails to show he committed an illegal act or neglected to perform a legal duty, which caused bodily injury to another person, as required. The People contend Ramage's claim is without merit and reversal is not warranted. We conclude substantial evidence supports the convictions and reject Ramage's claim.

### Relevant Background

The Information and Complaint alleged that Ramage's unlawful act that caused bodily injury was a violation of section 22107, which states: "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement."

The jury was instructed that "[t]he People allege that the defendant committed the following illegal act: Unsafe turning movement, in violation of Vehicle Code Section 22107" for both Counts 1 and 2. The jury was also instructed that to decide whether Ramage committed the unsafe turning movement, "the People must prove that: One, the defendant drove a vehicle; and, two, the vehicle turned from a direct course or moved right or left upon a roadway without reasonable safety."

In closing, the prosecution argued Ramage's illegal act was an unsafe turning movement. The prosecutor explained, "So when the defendant drove, he turned from a direct course or moved right or left without reasonable safety. It's clear, in this case, that's exactly what he did. He was in the -- well, first he veered over abruptly into the number three lane. [¶] Then he continued to veer over to the bicycle lane where there's

10.

two bicyclists that he hit." Witnesses stated that the two bicyclists were riding their bikes legally in the bike lane when Ramage veered to the right into the bike lane and hit them.

**Standard of Review**

A defendant claiming insufficient evidence on appeal "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) "In assessing such a claim, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1019; see also *People v. Johnson* (1980) 26 Cal.3d 557, 576-578 (*Johnson*); *Jackson v. Virginia* (1979) 443 U.S. 307, 319 (*Jackson*).) The court "presume[s] every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).) Importantly, reviewing courts "neither reweigh the evidence nor reevaluate the credibility of witnesses." (*People v. Jennings* (2010) 50 Cal.4th 616, 638; *Jackson, supra*, 443 U.S. at pp. 318-319.)

A reversal for insufficient evidence is not warranted " 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings, supra,* 50 Cal.4th at p. 639.)

**Applicable Law**

Section 23153 provides, in pertinent part: "(a) It is unlawful for a person, while under the influence of any alcoholic beverage, to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which

11.

act or neglect proximately causes bodily injury to any person other than the driver. [¶] (b) It is unlawful for a person, while having 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver."

"Subdivisions (a) and (b) have essentially four elements: (1) excessive alcohol intake, as differently defined by each subdivision; (2) driving a vehicle; (3) committing an act which violates the law or neglecting a duty imposed by law; and (4) causing bodily injury to another person." (*In re F.H.* (2011) 192 Cal.App.4th 1465, 1469.) To satisfy the third element, " 'the evidence must show an unlawful act or neglect of *duty in addition* to driving under the influence.' " (*People v. Givan* (2015) 233 Cal.App.4th 335, 349, quoting *People v. Weems* (1997) 54 Cal.App.4th 854, 858.) The unlawful act or omission "need not relate to any specific section of the Vehicle Code, but instead may be satisfied by the defendant's ordinary negligence." (*People v. Hernandez* (1990) 219 Cal.App.3d 1177, 1185; § 23153, subd. (c).)

"No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement." (§ 22107.)

**Analysis**

Our discussion is limited to Ramage's specific challenge that the evidence was insufficient to support the prosecution's theory that his illegal act or negligence of a legal duty was making an unsafe turning movement in violation of section 22107 prior to the accident. He claims "the evidence on this issue was conflicting and not substantial."

Our review of the record shows there is substantial evidence from which a reasonable trier of fact could find that Ramage made an unsafe turning movement in violation of section 22107 beyond a reasonable doubt. (See *Watkins*, *supra*, 55 Cal.4th at

12.

p. 1019; *Johnson*, *supra*, 26 Cal.3d at pp. 576-578.) Multiple eyewitnesses observed Ramage making an unsafe turning movement. S.D. explained how Ramage first veered into her lane and cut her off in such a way that she had to slam on her brakes. She then observed Ramage veer further to the right into the bike lane and hit the two bicyclists. B.T. observed Ramage swerve to the right and hit the two bicyclists who were in the bike lane. This was further corroborated by D.A. who testified he and A.B. were riding in the bike lane, and Officer Burdick who determined the area of impact was within the bike lane. Burdick opined that Ramage was at fault for the collision due to his unsafe turning movement in violation of section 22107.

We reject Ramage's argument that the evidence was not substantial due to conflicts in the evidence. Here, the fact that B.T. was nodding her head when her daughter made a statement to the police that she was "kind of far back" does not create a conflict with B.T.'s testimony that she was able to see the collision. B.T. explained that she was nodding her head in agreement to the statement her daughter just made "[t]hat we saw the cyclists get hit." The entire statement in question is as follows:

> "Well after. I saw the bicyclist, bicyclist umm after they hit [*sic*] because initially I mean I was kind of far back. I just saw something kind of round and darkish in color. And then as soon as a drove [*sic*]. Started getting closer I could see he had hit some [*sic*]. I thought it was a kid on a bike. I knew it was someone on a bike."

B.T. did not contradict herself here. And even if there were a conflict, the resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact, who must have found her credible. (See *Young*, *supra*, 34 Cal.4th at p. 1181.)

We reject Ramage's argument that Officer Burdick's opinion that Ramage was at fault for the collision was in conflict with his testimony that he did not know the location of the bicycles at the time of the collision. While Burdick did not observe the bicycles in their original positions, photographs were taken of the bicycles in their original positions.

13.

Therefore, Burdick had knowledge of the original position of the bicycles. Moreover, gouge marks on the roadway, the debris field, and the damage to Ramage's vehicle further informed Burdick's opinion that Ramage was at fault.

Ramage's argument that D.A. and A.B. were only near the bike lane misstates the evidence. Officer Burdick stated, "Based on the path of travel of the vehicle and the debris field being street and to the right along with the first markings being here, it led me to believe that this is where the collision occurred and everything was pushed forward and to the right by the westbound vehicle." Burdick indicated the location of the collision to the jury using a photograph. We cannot discern that location based on the record. However, Burdick clarified he believed the area of impact was "at the entrance of the bike lane." This corroborates S.D.'s testimony that the bicyclists were struck in the bike lane "near the beginning of the paint where it says 'bike.' " Viewing the evidence in the light most favorable to the judgment, together with the eyewitness accounts that the bicyclists were in the bike lane, there was substantial evidence that Ramage hit the bicyclists while they were in the bike lane.

We reject any argument that Ramage is less culpable because of a lack of lighting equipment on the bicycles or reflective gear and helmets on the riders. Even though Officer Burdick did not recall seeing any lighting equipment on the bicycles, D.A. testified their bicycles had red reflectors and that A.B.'s bicycle had a forward facing light. Regardless, two witnesses testified they plainly observed the bicyclists in the bike lane and S.D. indicated there was sufficient light in the area for her to see the bicyclists. Officer Burdick considered the area well-lit due to the nearby shopping center and lights on the side of the road. S.D. and B.T. also testified there was nothing obstructing their view of the bicyclists.

*People v. Levens* (1938) 28 Cal.App.2d 455 is readily distinguishable. In *Levens*, the defendant hit a car parked at a 45 degree angle, causing its occupant to be hospitalized for one month. (*Id*. at pp. 457-458.) The defendant admitted to having a few

14.

drinks but was not given any field sobriety tests.  (*Id*. at p. 458.)  The conviction was reversed because "the evidence adduced at trial is entirely lacking in the legal requirement that appellant … either committed any act forbidden by law or neglected to perform any duty imposed by law and that such act or neglect proximately caused injury…"  (*Id*. at p. 459.)  Here, on the other hand, the prosecution was well aware of this legal requirement and produced substantial evidence Ramage made an unsafe lane change which caused injury to A.B.

Similarly, *People v. Thurston* (1963) 212 Cal.App.2d 713, 714-717 is also inapposite.  In *Thurston*, the defendant was driving drunk, with his friend in the vehicle, when he collided with a parked vehicle, injuring his friend.  No one saw the accident, and the defendant and his friend were so drunk they remembered nothing.  The appellate court found the evidence insufficient to conclude that an unlawful act had been proven.  (*Id*. at pp. 715-716.)  The prosecution argued the unlawful acts were reckless driving, violating the basic speed law, making unlawful turning movements, and a lane violation.  (*Id*. at pp. 714-716.)  The appellate court, however, found insufficient evidence of defendant's car's speed, no evidence of reckless driving, and no evidence of turning and changing lane violations.  (*Id*. at pp. 715-717.)  Here, there were multiple witnesses who observed Ramage suddenly veer to the right and hit the two bicyclists in the bike lane.  Right before the collision, Ramage cut off S.D., causing her to have to slam on her brakes.  Further, Officer Burdick investigated the scene of the collision and determined from the evidence that Ramage caused the collision by making an unsafe turning movement.  Thus, there was substantial evidence that Ramage made an unlawful turning movement that caused the injuries to A.B.

**Clerical Errors in Abstract of Judgment**

The People ask the court to correct clerical errors in the October 12, 2023, minute order and abstract of judgment.  Specifically, the People allege the October 12, 2023,

minute order and abstract of judgment do not reflect the court's oral pronouncement of judgment.

**Relevant Law**

Courts have the inherent power to order the trial court to correct clerical errors in their records at any time. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-188.) "Where, as here, a discrepancy exists between the court's 'oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls.' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 893.)

**Analysis**

We conclude the following are clerical errors in the October 12, 2023, minute order and abstract of judgment. First, the oral pronouncement of judgment indicates the court imposed the low term of 16 months for Count 1. However, the minute order incorrectly states the middle term of 16 months was imposed on count 1. We order the clerk of the lower court to amend the minute order to reflect that the court imposed the low term of 16 months for Count 1.

Second, the court exercised its discretion to stay the one year section 23558 enhancement. However, the minute order states the enhancement pursuant to section 23558 was stayed pursuant to California Rule of Court, rule 4.447. We order the clerk of the lower court to amend the minute order to reflect the enhancement was stayed pursuant to the court's discretion.

Third, for Count 2, the court imposed the upper term of three years and stayed punishment pursuant to Penal Code section 654. The minute order states, "COUNT 2 STAYED PURSUANT TO PC 654," but does not list the specific term that was imposed and stayed. We order the clerk of the lower court to amend the minute order to reflect that the court imposed and stayed the upper term of three years on Count 2.

Last, the court imposed the upper term of four years on Count 3 and stayed punishment pursuant to Penal Code section 654. However, the minute order and abstract

16.

of judgment incorrectly state the middle term of three years was imposed and stayed. The error is a clerical error, which may be corrected. We order the clerk of the lower court to amend the minute order and abstract of judgment to reflect the court imposed and stayed the upper term of four years on Count 3.

## DISPOSITION

We order the clerk of the lower court to modify the minute order and abstract of judgment as directed above. In all other respects, the judgment is affirmed.


FAIN, J.*

WE CONCUR:


HILL, P. J.


SNAUFFER, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17.